This memorandum opinion was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                                          **NO. 28,131**

**PHILLIP WILLIAMS,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Albert S. "Pat" Murdoch, District Judge**

Gary K. King, Attorney General
Santa Fe, NM
M. Anne Kelly, Assistant Attorney General
Albuquerque, NM

for Appellee

Hugh W. Dangler, Chief Public Defender
Will O'Connell, Assistant Appellate Defender
Santa Fe, NM

for Appellant

### MEMORANDUM OPINION

**GARCIA, Judge.**

Defendant appeals from his convictions for second degree murder and

tampering with evidence. Defendant raises numerous issues on appeal that we have duly considered. We affirm Defendant's convictions.

**BACKGROUND**

In the early morning hours of August 5, 2003, Josephine Chacon (Victim) was stabbed to death in the parking lot of the Sandia Casino as she was getting into her car after her shift as a cashier. She was stabbed eighteen times. No one observed the slaying. Suspicion focused on Defendant because he and Victim had been romantically involved, Defendant left New Mexico immediately after the killing, Defendant's cell phone was found in the possession of a man who told police that he found the cell phone near a bloody knife that turned out to be the murder weapon, and Defendant's fingerprint was recovered from the scene imprinted in a smear of what the State maintained was Victim's blood.

The man who had found Defendant's cell phone led police to the place where he found it, and the police recovered the bloody knife as well as a cell phone belt clip that matched Defendant's cell phone. Through DNA testing, a serologist concluded that the blood on the recovered knife was Victim's blood. Through blood spatter and fingerprint experts, the State presented testimony that the fingerprints (a clear one and one that was more smudged) on Victim's car matched two of Defendant's fingerprints. The testimony also established that the clearer print was at the edge of a blood smear

of Victim's blood. Finally, this same blood smear was created as part of the same event creating the ridged fingerprint, according to the State's expert.

The State presented additional testimony that Victim had moved out of Defendant's apartment about two months prior to her death and that she had received threatening telephone calls from Defendant in the weeks before she was killed. Defendant abandoned his job and left New Mexico the day after the murder. The United States Marshal Service Fugitive Task Force found and arrested Defendant in Philadelphia in May 2005, almost two years after the murder, living under an alias.

Defendant testified in his own defense, stating that he had nothing to do with Victim's death and offering an alternate explanation for the murder, for leaving New Mexico, and for the presence of his fingerprints at the scene of the crime. Defendant sought to demonstrate that the murder was motivated by robbery or that it was the result of an unprovoked assault by a third party, possibly the man who found Defendant's cell phone. Defendant testified that he fled New Mexico because he had planned to go on the road and move back East. Defendant further testified that because he heard his name on the news, he was afraid. He testified that his fingerprints were on Victim's car because Victim drove to his apartment the day of the murder for a short visit.

In rebuttal, Victim's son testified that his mother slept in late that day and that

she never took the car out until she went to work that night. Defendant was convicted of second degree murder and tampering with evidence. This appeal followed.

**DISCUSSION**

**Issue 1 - Admission of Expert Opinion Testimony**

"The rule in this State has consistently been that the admission of expert testimony or other scientific evidence is peculiarly within the sound discretion of the trial court and will not be reversed absent a showing of abuse of that discretion." *State v. Fry*, 2006-NMSC-001, ¶ 55, 138 N.M. 700, 126 P.3d 516 (filed 2005) (internal quotation marks and citation omitted); *see State v. Alberico*, 116 N.M. 156, 169, 861 P.2d 192, 205 (1993). Rule 11-702 NMRA governs the admissibility of scientific evidence:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise.

Our Supreme Court explained the three prerequisites in Rule 11-702 for the admission of expert opinion testimony. *Alberico*, 116 N.M. at 166, 861 P.2d at 202. First, the expert must be qualified. *Id.* Second, the testimony must "assist the trier of fact." *Id.* Third, the "expert may testify only as to scientific, technical or other specialized knowledge." *Id.* (internal quotation marks and citation omitted). Given the capabilities of jurors and the liberal thrust of the rules of evidence, however, our

4

courts have held that "any doubt regarding the admissibility of scientific evidence should be resolved in favor of admission, rather than exclusion." *Lee v. Martinez*, 2004-NMSC-027, ¶ 16, 136 N.M. 166, 96 P.3d 291.

**A.      Opinion testimony by Agent Arthur**

Latent fingerprint (LP6), which witnesses identified as Defendant's fingerprint, was lifted from the outside driver's side window of Victim's car along with a sample of smeared blood (RS23), which witnesses identified as Victim's blood. The RS23 test sample was taken about two inches from the ridge detail of LP6. Prior to trial, Defendant filed a motion in limine, objecting to the State's witness, Agent Arthur, testifying at trial that LP6 was imprinted in blood or was a bloody fingerprint, because there had been no testing of the fingerprint itself to determine in what substance it was made. At the hearing on the motion, the district court ruled, and defense counsel agreed, that while Agent Arthur could not state conclusively that the fingerprint was made in blood, the State's witnesses could say the fingerprint was in "what appeared to be blood."

Later during the trial, the State asked Agent Arthur, "Is RS23 directly from a portion of LP6?" Before Agent Arthur responded to the question, Defendant objected on scientific foundational grounds. A bench conference ensued where Defendant explained, "my objection is going to be in terms of trying to link the two together

since one has not been tested, it is a scientific challenge to that testimony in their foundation that he is a fingerprint expert or that he knows the results of the fingerprints." The court overruled the objection and allowed "a question as to whether it was part of the same event." The State then asked Agent Arthur, "Was the smeared portion and the ridged portion part of the same event?" Agent Arthur replied, "Yes."

On appeal, Defendant continues to argue that Agent Arthur should not have been allowed to assert "that the fingerprint had been made in blood," because the substance in which the fingerprint was made was not actually submitted for serological testing. He further argues "that he was deprived of a fair trial when the State's witness was allowed to simply assume that the latent fingerprint was made in blood without establishing, for a fact, that it was or was not." We are not persuaded by Defendant's arguments.

Defendant characterizes Agent Arthur's testimony that RS23 and LP6 were part of the same event as an unsubstantiated assumption that the ridged fingerprint was made in blood. Even if we agree with this characterization, we cannot conclude that the district court abused its discretion in allowing the testimony. Defendant stipulated that Agent Arthur was a crime scene investigator expert. Agent Arthur testified at length about the different patterns of blood spatter he found at the scene. On cross-examination, Defendant had ample opportunity to demonstrate any weakness in Agent

Arthur's opinion. Defendant established that Agent Arthur was not a fingerprint or DNA expert and that Agent Arthur did not perform any of the laboratory tests on the samples. Defendant also established that it was possible to test the fingerprint but that the State had failed to request that the fingerprint be tested. Furthermore, the State acknowledged that RS23 was taken two inches from LP6. Agent Arthur's opinion that RS23 was one smear that ended in LP6 and constituted one event, a single smear ending in a fingerprint, was within the area of his investigative expertise. The basis for Agent Arthur's investigative opinion was fully explored. Under the circumstances, the challenge based on the Agent's failure to test the smear at the exact location of the fingerprint was not a matter of admissibility but went to the weight of the testimony, which was a matter for the jury to decide. *See State v. Anderson*, 118 N.M. 284, 301, 881 P.2d 29, 46 (1994) ("The assessment of the validity and reliability of the conclusions drawn by the experts, however, is a jury question. The jury is free to believe or disbelieve the expert testimony."). We affirm the ruling of the district court on this issue.

Defendant further contends that it was improper to place an expert on the stand to merely express a view of the evidence that is within the common experience of lay jurors. Defendant argues, therefore, that to "the extent that the physical evidence permitted an inference that the fingerprint was made in the same substance as the

bloodstain that was actually tested, [Agent] Arthur should not have been allowed to bolster the inference with his credentials as 'a crime scene expert.'" Defendant did not preserve these arguments below, and we decline to address them on appeal. *See* Rule 12-216(A) NMRA ("To preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked[.]"); *State v. Reyes*, 2002-NMSC-024, ¶ 41, 132 N.M. 576, 52 P.3d 948 (declining to review the merits of the defendant's argument on appeal because it was not preserved).

**B.      Qualifying the fingerprint expert**

The State called Shirley Garcia to testify as an expert in fingerprint identification.  Garcia testified that the fingerprint, LP6, lifted from the driver's window of Victim's car at the edge of the smear, RS23, matched Defendant's fingerprints.  Defendant contends that the district court erred in finding that Garcia "had the knowledge, skill, experience, training, or education needed to testify as a fingerprint identification expert." Defendant asks this Court to carefully scrutinize the district court's decision to qualify Garcia as a fingerprint expert.  We must carefully review the record as to Garcia's qualifications under an abuse of discretion standard of review.  *Fry*, 2006-NMSC-001, ¶ 55.

In *State v. Hernandez*, 115 N.M. 6, 24, 846 P.2d 312, 330 (1993), the Supreme Court held that a trial court did not abuse its discretion in qualifying a trace evidence

expert, who matched hairs from the crime scene to those of the victim and others. The expert did not have a scientific education but instead had sixteen years of training and experience performing trace evidence analysis, including hair analysis. *Id.* The Supreme Court noted that the language of Rule 11-702 is in the disjunctive so that a witness may be qualified by "knowledge, skill, experience, training *or* education." *Id.* (emphasis added); *see State v. McDonald*, 1998-NMSC-034, ¶ 20, 126 N.M. 44, 966 P.2d 752 (stating that "[t]he variety of bases for qualifying an expert comports with the wide discretion given the trial judge in the matter"). The Court also noted that any perceived deficiency in the expert's education and training, moreover, is relevant to the weight accorded by the jury to the expert's testimony and not to the testimony's admissibility. *Hernandez*, 115 N.M. at 24, 846 P.2d at 330.

Garcia testified that she was a forensic scientist in fingerprint and shoe and tire track analysis for the New Mexico Department of Public Safety. She also testified that she had been doing fingerprint analysis for over twenty years, since 1984, and that she had been in her current position for thirteen years. Most of Garcia's training in fingerprint analysis was through the FBI where she received specialized training in fingerprint and palm print identification. Garcia has a diploma from the American Institute of Applied Science (AIA) where she studied several areas of forensic science, focusing primarily on fingerprint identification. She has completed yearly proficiency

9

testing in the area of fingerprints and has attended schools and conferences to keep abreast of the latest technology. Garcia further testified that she has taught at the law enforcement academy and the community college, that she has analyzed "[h]undreds of thousands of fingerprints," has testified in court, and that she has been qualified previously as a fingerprint identification expert.

Over Defendant's objection on "[f]oundation," the district court qualified Garcia as an expert in the field of fingerprint identification, analysis, and comparison. After reviewing the record, we cannot say that the district court abused its discretion in qualifying Garcia as an expert in fingerprint identification. *See McDonald*, 1998-NMSC-034, ¶¶ 10, 20 (holding that the trial court did not abuse its discretion in qualifying a witness in DNA analysis who held a bachelor's degree in biology, had training in a University of New Mexico course in molecular biology, and had taken a course in DNA analysis); *Hernandez*, 115 N.M. at 24, 846 P.2d at 330 (holding that a hair analysis expert is sufficiently qualified based solely upon his training and experience). We note that, despite Defendant's contentions, there was no evidence or authority before the district court indicating that certification from the IAI was a necessary "minimum qualification" in the area of fingerprint identification. *Cf. State v. Padilla*, 66 N.M. 289, 298-99, 347 P.2d 312, 318-19 (1959) (holding that under the circumstances of that case, that particular psychologist did not possess the required

10

education and experience to testify as to the defendant's sanity).

After she was qualified as an expert, Garcia testified about fingerprint analysis in general and opined that LP6 contained more than enough ridge detail to make a comparison to Defendant's prints. She also testified that she was "100 percent" positive that LP6 was a match for Defendant's fingerprints, and she noted that LP6 was very clear, which made the comparison analysis easy. Any alleged deficiency in Garcia's training and education is "relevant to the weight accorded by the jury to [the] testimony and not to the testimony's admissibility." *See McDonald*, 1998-NMCA-034, ¶ 21 (alteration in original) (internal quotation marks and citation omitted). As appropriate under the applicable law, we defer to the jury's determination of the facts. *See State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829 (filed 1998). We affirm the district court's decision to qualify Garcia as an expert in fingerprint identification analysis.

**C.      Admission of Detective Applegate's testimony**

Defendant argues that the district court "erred in allowing [Detective Applegate] to testify that his specialist training allowed him to understand that [Victim's] killer was motivated by rage or jealousy." We interpret Defendant's argument on appeal to be that Detective Applegate's testimony was not appropriate and improperly introduced as "profile evidence." Defendant only objected during the

11

trial to Detective Applegate's testimony based on lack of foundation and because the witness was "telling the jury how to interpret evidence." Thereafter, the State and the court established a sufficient foundation for Detective Applegate to testify about his investigative techniques as the lead state police crime scene investigator at the scene. Detective Applegate explained his background training and experience in homicide investigation, including specialized training in establishing potential suspects based upon the nature of the crime and how it was committed. The court overruled Defendant's objections. Defendant never objected that the testimony was being improperly admitted as profile evidence. Defendant does not challenge the district court's rulings based upon the objections made at trial, foundation and interpreting the crime scene evidence. We decline to rule on Defendant's new profiling argument because he did not preserve this argument. *See* Rule 12-216(A); *Reyes*, 2002-NMSC-024, ¶ 41.

**Issue 2 - Admission of Hearsay Testimony**

We review the district court's admission of hearsay statements for an abuse of discretion. *State v. Balderama*, 2004-NMSC-008, ¶ 46, 135 N.M. 329, 88 P.3d 845. "The New Mexico Rules of Evidence prohibit the use of out-of-court statements, offered to prove the truth of the matter asserted, unless such a statement falls into a recognized hearsay exception and is relevant and otherwise admissible." *Id.*; *see* Rule

11-401 NMRA; Rule 11-403 NMRA; Rule 11-801 NMRA (describing the hearsay rule). "[I]f an out-of-court statement is offered in evidence merely for the purpose of establishing what was said at the time, and not for the truth of the matter, the testimony is not hearsay." *Reyes*, 2002-NMSC-024, ¶ 29. In addition, statements offered for a purpose other than their truth are not hearsay. Rule 11-801(C); *see State v. Rosales*, 2004-NMSC-022, ¶ 16, 136 N.M. 25, 94 P.3d 768 ("Extrajudicial statements or writings may properly be received into evidence, not for the truth of the assertions therein contained, or the veracity of the out-of-court declarant, but for such legitimate purposes as that of establishing knowledge, belief, good faith, reasonableness, motive, effect on the hearer or reader, and many others." (emphasis omitted) (internal quotation marks and citation omitted)).

**A.    Aragon testimony**

Defendant argues on appeal that the district court erred in allowing Tiffany Aragon, Victim's friend and co-worker at the casino, to testify that on the day of the incident, she heard Victim tell Defendant over the phone, "[W]hy can't you leave me alone?" The State contends that Defendant did not adequately preserve his objection. During a bench conference at trial, Defendant objected that the statement should not be allowed as an excited utterance. Defendant argued that an angry reaction to a consensual cell phone call is an insufficient basis to find an excited utterance. The

13

district court issued a conditional ruling, stating that if the State could establish that the statement was made while Victim was "undergoing the stress of the excitement caused by the event or condition," it would allow the testimony. The State continued with questioning, and Aragon testified that she heard Victim ask, "[W]hy can't you leave me alone?" Aragon also testified that Victim was extremely angry about the messages and that she knew Victim was upset because Victim was yelling, which she did not usually do. Defendant neither renewed his original objection nor offered an objection on the basis that the State had failed to lay a proper foundation for the excited utterance exception. We hold that Defendant failed to preserve his objection for appeal after the requested excited utterance foundation had been presented by the State without further objection. *See* Rule 12-216(A); *State v. Vallejos*, 1998-NMCA-151, ¶ 31, 126 N.M. 161, 967 P.2d 836 (holding that the defendant did not preserve the objection on an alleged discovery violation when he failed to renew the objection after the trial court deferred ruling).

**B.    Gallegos testimony**

Defendant argues that the district court improperly allowed Lawrence Gallegos, Victim's brother, to testify that Defendant used a phone other than his own to call Victim. Specifically, Defendant contends that the testimony was hearsay and that the State did "an end run around" the district court's ruling on hearsay regarding what

Victim told Gallegos about Defendant using another phone to call her. We agree with Defendant.

The State wanted to introduce the testimony of Gallegos that Victim told him that Defendant began using a different phone to contact her several days before her death. During a bench conference, the district court ruled that such testimony would be inadmissible hearsay and refused to qualify Victim's statements for admission as excited utterances, as the State contended. As such, Gallegos testified that Victim became upset by the number of phone calls that she received from Defendant and stopped answering the phone. The State then asked Gallegos what he "notice[d], if anything, about when [Victim] does answer her phone on some occasions?" Gallegos answered, "He'd catch her off guard and call from a different number." Defense counsel objected on "[l]ack of foundation and speculation," but the district court overruled the objection, telling the prosecutor to go ahead but to move onto another area. The prosecutor then asked Gallegos, "Can you describe just her actions when that happened, just her actions?" Gallegos answered, "Just angry. Angry."

We agree with Defendant that the State did not lay the proper foundation for the objectionable testimony. Before introducing the testimony, the State had to establish that Gallegos had personal knowledge that Defendant would call Victim from other phone numbers. *See* Rule 11-602 NMRA ("A witness may not testify to a matter

15

unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). The State, however, did not present evidence to establish that Gallegos had personal knowledge of this different phone number being used by Defendant. The State did not present evidence that Gallegos either saw the other phone numbers on Victim's phone or had other personal knowledge that Defendant used phone numbers other than his own to call Victim. The State was unable to rely upon Victim's statement to Gallegos as the basis to lay the necessary foundation for this different phone number testimony because it was inadmissible hearsay. The necessary foundation for the objectionable testimony was never presented by the State. Therefore, the district court abused its discretion in allowing this phone number testimony, which relied upon Victim's inadmissible hearsay statement as the only foundation for its admissibility.

Despite this erroneous evidentiary ruling, we agree with the State that the error was harmless. The alleged error in this case is non-constitutional because the error Defendant established was only on evidentiary grounds. *See State v. Barr*, 2009-NMSC-024, ¶ 58, 146 N.M. 301, 210 P.3d 198 (reviewing a statement improperly admitted under the rules of evidence for harmless error under the non-constitutional standard). "[N]on-constitutional error is reversible only if the reviewing court is able to say, in the context of the specific evidence presented at trial, that it is reasonably

16

probable that the jury's verdict would have been different but for the error." *Id.* ¶¶ 54-56 (recognizing the factors for determining harmless error are "(1) substantial evidence to support the conviction without reference to the improperly admitted evidence; (2) such a disproportionate volume of permissible evidence that, in comparison, the amount of improper evidence will appear minuscule; and (3) no substantial conflicting evidence to discredit the [s]tate's testimony." (footnote omitted)). The State did not rely upon or repeat Gallegos' statement. The fact that Defendant threatened and harassed Victim by telephone in the weeks and on the day of the murder was supported by other testimony. Aragon testified that on the day of the murder she heard a message on Victim's cell phone saying, "You're dead to me." Gallegos testified that he had previously heard messages from Defendant to Victim that said, "Bitch, you come into my life, you wreck it[,] and I'll kill you. . . . You're already dead to me. . . . You'll pay. You will pay." The jury saw, through photographs and testimony, the extensive and brutal nature of the attack on Victim. The physical evidence of the knife covered with Victim's blood found near Defendant's cell phone and cell phone belt and Defendant's fingerprint in a single smear of Victim's blood greatly diminish the strength of Gallegos' improper testimony. Finally, no conflicting evidence was offered to attribute the "off guard" phone calls to a different caller. We are satisfied that there is no reasonable

probability that error in the admission of Gallegos' improper statement affected the verdict.

**C.     Becerra's prior written statement**

Defendant argues that Robert Becerra, who worked at Sandia Casino at the time of Victim's death, was improperly allowed to read into the record his statement that he gave to casino security the night of Victim's murder.  Rule 11-803(E) NMRA provides as follows:

> **Recorded recollection.**  A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness's memory and to reflect that knowledge correctly.  If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

In Becerra's statement, he said that he arrived at the old casino parking lot at about 7:50 p.m. for his work shift and saw an African-American man in a red car that looked like a Ford Fiesta.  The man was wearing a baseball cap and smoking a cigarette. Becerra watched him because it looked like he was trying to open cars.  When the shuttle arrived, Becerra asked the driver to call security, and Becerra then saw the suspicious man drive away.

At trial, Defendant first objected to the admission of the statement on the basis that Becerra could not remember making it.  The issue of Becerra's recollection of

18

making the statement was then fully explored. Becerra explained that some time after making the statement to security, he was involved in a serious car accident that affected his memory. Becerra expressed some confusion about his statement to casino security and a police report that he had made when his house was burglarized around the same time. Becerra also testified, however, that while he could not recall the details of the statement, he recalled making the statement, he had no reason to lie about it, and he stated, "This is a factual statement that I made at that time." The district court noted that Becerra seemed confused about only whether his statement to casino security should be called a police report. The State then pointed out that Becerra knew that he made a statement and that his statement was the one in question at trial. In response, defense counsel agreed that "[i]f that's what the testimony was," the statement could be read into the record but not admitted into evidence in accordance with the rule. Defense counsel withdrew her objection, stating, "[S]o I won't make any objections if all he's doing is going to read the statement into evidence."

On appeal, Defendant contends that the statement should not have been read into the record because "Becerra was unable to state that the memorandum he gave to the security officer or officers was correct when made." As demonstrated above, however, the record does not support Defendant's contentions, and Defendant waived

this objection at trial. Defendant failed to preserve his right to appeal Becerra's reading of his statement into the record. *See* Rule 12-216(A). We reject Defendant's argument at this time.

**D.      Testimony about Defendant's alias**

Prior to trial, Defendant requested that the district court exclude any evidence of Defendant's use of an alias on the basis that such evidence is irrelevant, prejudicial, and inadmissible hearsay. The State argued that the evidence was not hearsay because it was not being offered for the truth of the matter asserted. The district court did not address Defendant's hearsay argument, and it agreed to allow the testimony for the limited basis of establishing how Defendant was located and arrested. The court reasoned that Defendant's use of an alias, along with Defendant's flight from New Mexico, was admissible to establish Defendant's consciousness of guilt. On appeal, Defendant argues that the district court should have prevented police witnesses from "passing on the hearsay they overheard while searching for [Defendant]." He also argues that the fact that Defendant used many aliases was not essential to the police procedural narrative and that this narrative amounted to an irrelevant "sideshow."

During Agent Kurtz' testimony, the State asked Agent Kurtz if he remembered the alias Defendant was using when the police found Defendant. Defendant again objected on hearsay grounds. The district court overruled the objection without an

explanation. Agent Kurtz then stated, "Clayton Atier."

A review of the record reveals that the district court abused its discretion in allowing testimony regarding Defendant's alias. Although this "use of an alias name" evidence might have been relevant to show consciousness of guilt, *see State v. Gibson*, 113 N.M. 547, 555, 828 P.2d 980, 988 (Ct. App. 1992) (stating that evidence of the defendant's flight to Mexico and use of an alias was "clearly admissible to show consciousness of guilt"), it was offered for the truth of the matter asserted and did not fall into one of the exceptions for hearsay.

The State argued that the evidence was not offered for the truth of the matter asserted. We disagree. The evidence was offered to prove that Defendant was in fact using an alias name when the authorities found him (as opposed to whether Defendant's name was Clayton Atier or not), thus making the use of this alias name relevant to show Defendant's consciousness of guilt. Since the "use of an alias" evidence was offered for the truth of the matter asserted, the State was required to lay the foundation for actual knowledge of said use or an appropriate hearsay exception before having Agent Kurtz testify regarding the use of this alias. *See* Rules 11-802 to -804 NMRA. The State failed to lay such a foundation. As a result, the use of an alias evidence that originated from a hearsay source and passed on to Agent Kurtz should not have been admitted under Rule 11-801.

Again, we conclude that the admission of this hearsay testimony was harmless error. *See Barr*, 2009-NMSC-024, ¶ 62 (holding that where "there was substantial evidence to support Defendant's convictions without reference to the videotaped statement, such a disproportionate volume of permissible evidence that the improper evidence was minuscule in comparison, and a lack of significant conflicting evidence overall", there was no reasonable probability that admission of a videotaped statement contributed to the defendant's conviction). Agent Kurtz' testimony about Defendant's use of an alias was brief and was offered to explain how Defendant was located. As previously discussed, there was other overwhelming evidence demonstrating Defendant's guilt and other corroboration evidence of Defendant's consciousness of guilt. Finally, there was no conflicting evidence offered that Defendant was not using an alias name at the time of his arrest in Philadelphia. We therefore hold that the district court committed harmless error in allowing the improper hearsay testimony regarding Defendant's use of an alias name at the time police located him.

**Issue 3 - Defendant's Right to Cross-Examine Espinoza**

On appeal, Defendant contends that the district court abused its discretion in not allowing him to cross-examine Javier Espinoza about the fact that Espinoza lied regarding his immigration status in a pretrial interview. Defendant argues that Espinoza's lie constituted a specific instance of dishonest conduct relevant to

Espinoza's character for untruthfulness. Defendant also contends that the district court's ruling violated his state and federal constitutional right of confrontation. Defendant failed to lay the foundation for and preserve these arguments.

Prior to trial, the State asked that the district court to exclude any mention of information concerning the immigration status of Espinoza because it was irrelevant, immaterial, and misleading to the jury. Defendant argued that Espinoza was dishonest about his immigration status in an interview, and as a result, it was relevant to the trial. The following exchange between the court and defense counsel followed.

> Ms. Zarkos: . . . When we interviewed him, we asked him what his immigration status was, and he indicated that he had been on a work permit for the last 15 years . . . . Furthermore, . . . we asked him, "Well, then were you paying taxes under a workers ID?" He indicated no, that he had not been paying taxes.
> The Court: How is this all relevant, Ms. Zarkos?
> Ms. Zarkos: Well, we think that under 608 and 609, that it goes towards his credibility as a witness, because he didn't pay taxes, and then he told us that he did, but he used his brother's name.

The district court then ruled that the evidence was irrelevant.

Nothing in the record indicates that Espinoza lied about his immigration status. If anything, he may have been inconsistent in his responses about paying his taxes. The fact that he did or did not pay taxes is not conclusive evidence of Espinoza's immigration status. Defendant has failed to establish the factual basis he relies upon for the arguments regarding Espinoza's purported lying about his immigration status

23

or otherwise present a sufficient record for a proper review of Espinoza's immigrations status. *See State v. Robinson*, 99 N.M. 674, 676, 662 P.2d 1341, 1343 (1983) ("It should be understood by all courts that the only relevant circumstance is actual conduct, i.e., the fact, not the mere charge, of having misbehaved." (internal quotation marks and citation omitted)). We affirm the district court's ruling on this issue. *See Rojo*, 1999-NMSC-001, ¶ 44 (stating that we will not search the record on appeal to determine if an issue was preserved); *State v. Jim*, 107 N.M. 779, 780, 765 P.2d 195, 196 (Ct. App. 1988) (stating that this Court will resolve all inferences in favor of the district court's decision when the defendant fails to meet his burden of providing a record sufficient for review of his issues on appeal).

**Issue 4 - Defendant's Jury Instruction Defining Reasonable Doubt**

Relying on *State v. Franklin*, 78 N.M. 127, 129, 428 P.2d 982, 984 (1967), and *State v. Boyer*, 103 N.M. 655, 658-60, 712 P.2d 1, 4-6 (Ct. App. 1985), Defendant contends that the district court's refusal to instruct the jury as he requested on the instruction for reasonable doubt constitutes reversible error. He argues that the district court erred because he tendered a proposed jury instruction that is a correct and accurate statement of a basic legal principle.

The standard of review we apply to jury instructions depends on whether the issue has been preserved. *State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34

24

P.3d 1134. "If the error has been preserved we review the instructions for reversible error." *Id.* If not, we review for fundamental error. *State v. Cunningham*, 2000-NMSC-009, ¶ 8, 128 N.M. 711, 998 P.2d 176. Under both standards we seek to determine "whether a reasonable juror would have been confused or misdirected by the jury instruction." *Id.* ¶ 14 (internal quotation marks and citation omitted).

In this case, the alleged error was preserved when Defendant tendered a proposed jury instruction on reasonable doubt that read: "Reasonable doubt is one based on reason which arises from the evidence, the lack of evidence, or the nature of the evidence." The district court denied the tendered instruction and instructed the jury using the UJI 14-5060 NMRA definition of reasonable doubt. We determine that the proper instruction was given and affirm.

The New Mexico Uniform Jury Instructions define reasonable doubt as "a doubt based upon reason and common sense — the kind of doubt that would make a reasonable person hesitate to act in the graver and more important affairs of life." UJI 14-5060. Our Supreme Court expressly denied the validity of any changes to the wording or language of the UJI 14-5060 reasonable doubt instruction:

> We need to be clear on this subject. The definition of proof beyond a reasonable doubt remains today what it has been for decades, perhaps longer. UJI 14-5060 adequately expresses that definition and is to be used in all jury trials, unadorned by any added, illustrative language from this or any other opinion.

*State v. Garcia*, 2005-NMSC-017, ¶ 10, 138 N.M. 1, 116 P.3d 72. Accordingly, we affirm the district court's decision to deny Defendant's tender of a jury instruction altering UJI 14-5060, which is the Supreme Court's mandated definition of "reasonable doubt."

**Issue 5 - Ineffective Assistance of Counsel**

Defendant argues that his trial counsel was ineffective for failing to call a potential alibi witness, Tamara Rideout, and for failing to strike a juror, Sheyla Lofties, who had been exposed to pretrial publicity. "In order to prevail on an ineffective assistance of counsel claim, a defendant must show deficiency on the part of counsel and that such deficiency resulted in prejudice." *State v. Gonzales*, 2007-NMSC-059, ¶ 14, 143 N.M. 25, 172 P.3d 162. The burden of proof is on defendant to prove both prongs of the ineffective assistance test. *State v. Hester*, 1999-NMSC-020, ¶ 9, 127 N.M. 218, 979 P.2d 729. There is a general presumption that trial counsel provided effective assistance. *State v. Baca*, 1997-NMSC-045, ¶ 20, 124 N.M. 55, 946 P.2d 1066, *overruled on other grounds by State v. Belanger*, 2009-NMSC-025, ¶ 36, 146 N.M. 357, 210 P.3d 783. "Defense counsel's performance is deficient if counsel's representation fell below an objective standard of reasonableness." *State v. Roybal*, 2002-NMSC-027, ¶ 21, 132 N.M. 657, 54 P.3d 61 (internal quotation marks and citations omitted). Whether a defendant was prejudiced

depends on "whether the allegedly incompetent representation prejudiced the case such that but for counsel's error, there is a reasonable probability that the result of the conviction proceeding would have been different." *Baca*, 1997-NMSC-045, ¶ 20.

**A.     Failure to call an alibi witness**

On the second day of trial, Defendant filed a notice of intent to claim an alibi. Three days later, Defendant filed a memorandum of law and exhibits, arguing that the late disclosure of Rideout's testimony was not intentional and that it was exculpatory. Defendant's alleged alibi consisted of the proposed testimony of Tamara Rideout that she was with Defendant until 2:00 a.m. on the night of the murder. Although the notice of alibi was untimely filed, *see* Rule 5-508(A) NMRA (requiring the defendant to provide notice of an alibi defense no later than ten days before trial), the district court allowed the parties to investigate the witness, and the State ultimately did not object to Rideout testifying at trial. Thereafter, however, defense counsel decided not to call the witness.

We cannot say that Defendant has established a prima facie case of ineffective assistance of counsel on direct appeal. First, as the district court judge noted, Rideout's testimony was "a really double-edged sword" that could either assist or detract from Defendant's case. While Rideout's testimony would have been that she was with Defendant until 2:00 a.m. on the morning of the murder, the trial testimony

27

established that the murder happened after 3:00 a.m. Victim's co-worker testified that her shift with Victim ended at about 2:30 a.m. and that they stayed at the casino for a while afterwards, watching television. The shuttle driver testified that Victim was on his shuttle to the casino's outer parking lot at 3:00 a.m. In addition, Defendant testified that he stayed home on the night of the murder, but he did not mention Rideout. Rideout's testimony was not a complete alibi, and her testimony could have either helped or hindered Defendant's case.

As such, defense counsel's decision not to call Rideout to testify was a strategic one. On appeal, we will not second guess counsel's trial strategy. *Lytle v. Jordan*, 2001-NMSC-016, ¶ 43, 130 N.M. 198, 22 P.3d 666; *see Gonzales*, 2007-NMSC-059, ¶ 14 (stating that the presumption of effective assistance will remain intact as long as there is a reasonable trial tactic explaining counsel's performance). Moreover, there is no basis on the present record for this Court to determine that defense counsel's decision was outside the realm of competence or prejudicial to Defendant's case. *See Roybal*, 2002-NMSC-027, ¶ 19 (stating that "[w]hen an ineffective assistance claim is first raised on direct appeal, we evaluate the facts that are part of the record"). Finally, if there are any facts necessary for a full determination that are not part of the record on direct appeal, an ineffective assistance claim is more properly brought through a habeas corpus petition. *Id.* Under the circumstances, we cannot say that

defense counsel provided Defendant with ineffective assistance with regard to this alibi issue presented on direct appeal.

**B.      Failure to disqualify a juror**

Defendant argues that defense counsel's failure to strike Lofties from the jury when her name was called before the defense had exhausted its peremptory challenges constituted ineffective assistance of counsel.  Defendant contends that Lofties should have been struck as a juror because she was exposed to "an intolerable amount of pretrial publicity" and because she stated during voir dire that she was "devastated" as a child by witnessing her mother's abuse at the hands of her drunken stepfather. Defendant contends that the failure to strike Lofties provides a prima facie case of ineffective assistance of counsel and that remand for an evidentiary hearing will establish that trial counsel's lapse was not an excusable tactical decision and that it prejudiced Defendant.  We are not persuaded.

Lofties indicated that she remembered that there was a murder at the Sandia Casino in 2003 "a stabbing of a black male against a Hispanic female," that on the night before her voir dire she had seen on TV that Defendant was getting ready to go to trial, and that she had seen Defendant in his orange jumpsuit being brought into the court.  When questioned by the district court, however, Lofties stated that she could "[a]bsolutely" set the media coverage aside and that she had "no doubt" that she could

decide this case based solely on what she heard in the courtroom. Lofties also stated that she had not decided anything based on her exposure, had not discussed Defendant's guilt or innocence, and had not developed any impressions about Defendant. She indicated that although she had witnessed her mother's abuse, she had also experienced her mother staying with her stepfather because she loved him. Although a prisoner coming into court for trial is entitled to make his appearance free of shackles or bonds, prior cases have held that an inadvertent or insignificant exposure to a defendant in shackles is not sufficiently prejudicial to merit a new trial. *See, e.g.*, *State v. Holly*, 2009-NMSC-004, ¶¶ 41-42, 145 N.M. 513, 201 P.3d 844. Given her responses to the district court's specific questions, there is no indication that Lofties' exposure to pretrial publicity was significant or that Lofties had any actual or implied bias toward Defendant. *State v. Sanchez*, 120 N.M. 247, 251-53, 901 P.2d 178, 182-84 (1995) (discussing a claim of juror bias and determining that, absent exceptional circumstances justifying a finding of implied bias, a defendant must demonstrate actual bias). Lofties never wavered in stating that she could fairly and impartially try the case based on the evidence presented in court. The fact that defense counsel chose not to strike Lofties in order to save his last strikes for other potential jurors is a strategy decision, and we do not have the record on direct appeal for determining otherwise. *See Hester*, 1999-NMSC-020, ¶ 11 ("It is not the role of this

Court on appeal to second guess trial tactics."). As such, we cannot say that Defendant has made a prima facie case of ineffective assistance of counsel with regard to defense counsel's decision not to strike Lofties. Accordingly, we affirm on this peremptory challenge issue raised on direct appeal.

**Issue 6 - Sufficiency of the Evidence**

Relying on *Franklin*, 78 N.M. at 129, 428 P.2d at 984, and *Boyer*, 103 N.M. 658-60, 712 P.2d at 4-6, Defendant argues that this case presents circumstances "where this Court should review the [record as a] whole, including his testimony in his own defense, and conclude that the evidence was insufficient for a rational jury to conclude, beyond a reasonable doubt, that he was [Victim's] killer." The applicable standard of review for sufficiency of the evidence "is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988). We review the evidence "in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *Cunningham*, 2000-NMSC-009, ¶ 26.

In this case, the jury was instructed that in order to find Defendant guilty of second degree murder, the State must prove beyond a reasonable doubt each of the

31

following elements of the crime: (1) Defendant killed Victim; (2) Defendant knew that his acts created a strong probability of death or great bodily harm to Victim; (3) this happened in New Mexico on or about August 5, 2003. The jury was also instructed that "[g]reat bodily harm means an injury to a person which creates a high probability of death" and that the State must prove to the satisfaction of the jury beyond a reasonable doubt that Defendant acted intentionally when he committed the crime. With regard to the tampering with evidence charge, the jury was instructed that the State must prove beyond a reasonable doubt each of the following elements of the crime: (1) Defendant destroyed and/or changed and/or hid and/or placed a knife; (2) Defendant intended to prevent the apprehension, prosecution, or conviction of himself; and (3) this happened in New Mexico on or about August 5, 2003.

At trial, the State presented the testimony of numerous witnesses that in the early morning hours of August 5, 2003, Victim was stabbed eighteen times with a knife and died of her wounds. Victim's purse was not stolen. No one witnessed the stabbing, but within minutes of the attack, Victim's co-worker heard Victim's screams and rushed to her side. Victim was covered in blood and died in the ambulance on the way to the hospital. The State presented evidence that Defendant and Victim had been romantically involved. Victim had moved out of Defendant's apartment two months earlier, and she had received numerous threatening and harassing telephone calls from

Defendant in the days before she was killed. Defendant's fingerprint, LP6, was found at the scene of the crime as part of a smear of Victim's blood, RS23. A blood spatter expert testified that the RS23 and LP6 were created in one event. The jury could reasonable infer, therefore, that the fingerprint did not preexist the blood smear. A fingerprint expert testified that LP6 matched Defendant's fingerprints. Defendant's cell phone was found in the possession of a man who led police to a culvert where the knife and a cell phone belt clip that matched Defendant's cell phone were found. Defendant abandoned his job and fled New Mexico immediately after the crime. He was located almost two years later in Philadelphia.

In addition to cross-examining the State's witnesses, Defendant testified at trial, denying that he killed Victim. Defendant offered an alternate explanation for leaving New Mexico and for his fingerprint being found at the scene of the crime. The jury rejected Defendant's testimony. *See State v. Huff*, 1998-NMCA-075, ¶ 11, 125 N.M. 254, 960 P.2d 342 (recognizing that where a defendant's testimony conflicts with that of his accusers, the jury is entitled to disregard the defendant's version of the facts).

We hold that the State presented substantial evidence such that a reasonable jury could conclude that Defendant was guilty of the crimes of second degree murder and tampering with evidence. We therefore affirm Defendant's convictions.

**Issue 7 - Cumulative Error**

Defendant contends that the cumulative impact of the errors he asserts on appeal deprived him of a fair trial. The doctrine of cumulative error requires reversal of a defendant's conviction when the cumulative impact of errors which occurred at trial was so prejudicial that the defendant was deprived of a fair trial. *State v. Martin*, 101 N.M. 595, 600-01, 686 P.2d 937, 942-43 (1984). We have identified two errors at trial stemming from the testimony of Victim's brother and Agent Kurtz. The two errors resulted in harmless error, and their cumulative effect did not deprive Defendant of a fair trial. *See State v. Woodward*, 121 N.M. 1, 12, 908 P.2d 231, 242 (1995) (stating that the cumulative error doctrine is to be strictly applied and not invoked if the defendant received a fair trial). We reject Defendant's cumulative error argument.

**CONCLUSION**

We affirm Defendant's convictions for second degree murder and tampering with evidence.

**IT IS SO ORDERED.**

_____
**TIMOTHY L. GARCIA, Judge**

**WE CONCUR:**

34

_____

**MICHAEL D. BUSTAMANTE, Judge**


_____

**CELIA FOY CASTILLO, Judge**

35