2002-NMSC-027

54 P.3d 61

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Greg ROYBAL, Defendant–Appellant.**

**No. 26,967.**

Supreme Court of New Mexico.

Aug. 19, 2002.

Phyllis H. Subin, Chief Public Defender, Karl Erich Martell, Asst. Appellate Defender, Santa Fe, NM, for Appellant.

Patricia A. Madrid, Attorney General, M. Anne Kelly, Asst. Attorney General, Santa Fe, NM, for Appellee.

## OPINION

MINZNER, Justice.

{1} Defendant appeals directly to this Court from a judgment and sentence of life imprisonment plus sixteen years, entered following convictions by a jury of first degree murder, contrary to NMSA 1978, § 30-2-1(A)(1) (1994), and conspiracy to commit first degree murder, contrary to NMSA 1978, § 30-28-2 (1979) and Section 30-2-1(A). We have jurisdiction under Rule 12-102(A)(1) NMRA 2002 and N.M. Const. art. VI, § 2. On appeal, Defendant argues first that he received ineffective assistance of counsel when his trial counsel failed to notice that a portion of a taped statement introduced into evidence referred to Defendant's prior participation in and conviction for second degree murder in a locally notorious crime. The trial court had ruled before the trial that if Defendant testified, he could not be cross-examined about the prior murder conviction. Second, Defendant argues that the cumulative effect of the error of his trial counsel, the prosecutor, and the trial court in allowing the jury to hear these statements deprived him of a fair trial. Although we conclude that defense counsel's performance was deficient in failing to redact the objectionable material, we conclude that Defendant was not prejudiced thereby, as prejudice has been defined in our case law. As we are not persuaded by either of Defendant's claims on appeal, we affirm.

### I.

{2} On September 13, 1999, Nicky Cordova was killed in his Chimayo home by thirty-two separate sharp force wounds and four blunt force wounds. Defendant claimed at trial that he had an alibi; he argued that at the time of the killing he was at a party at his sister's house. Contrary to this defense, the State presented an eyewitness who identified Defendant as one of two people at the scene of the crime, another witness who testified that Defendant admitted to participating in the killing, and evidence that Defendant's girlfriend's car was identified at the scene of the crime and later found burnt and

abandoned. Defendant's appellate issues require a more complete review of the evidence than is ordinarily necessary. Our review is based on the briefs and the taped transcript of the proceedings. We first discuss the evidence presented at trial, then the pretrial rulings, and finally the motion for a new trial.

### A.

{3} Diane Martinez, the victim's sister, was doing the wash at her house in the Chimayo compound where the victim also lived when she noticed a black, shiny car with chrome rims and tinted windows drive towards the victim's house. Ten minutes later, when she was outside hanging the clothes, she noticed the same car drive by again. Shortly after seeing the car pass by a second time, she heard the sounds of an argument coming from Nicky's house and went to investigate. When she arrived at the house and knocked on the front door, a man asked her who she was. When she said that she was Nicky's sister, the man told her that Nicky wanted her to come back later. Diane went to an open window, and because she could hear her brother moaning, she tried to open a door to the house. A man slammed the door on her, and she tried again. This time, when the door was halfway open, one of the men inside came to the door and pointed a gun directly at her face. On direct examination, Diane testified that Defendant was this man. Diane ran to the side of the house and observed two men leave. One of these two men, not the man she identified as Defendant, was wearing glasses and pointed a gun directly at her as he was leaving; as a result, she hid behind a tree. On further direct examination, however, Diane had trouble remembering whether the person with the glasses had a gun or not. Diane memorized the license plate as the men drove away. She then went into the house and found her brother lying on the floor, covered in blood. When she called 911 for help, she also reported the license plate number to the 911 operator.

{4} During the police investigation Diane made several identifications from photo arrays prepared by the police. She identified Defendant as the man who pointed the gun at her from a photo array that was shown to her the next day. She also identified Leland Martinez as the second suspect. As a result of this identification, Leland was initially charged for the murder. She later testified that when she saw an article in a local paper with pictures of Defendant and Ricky Roybal, Defendant's brother, she realized that the other suspect was not Leland, but Ricky. She subsequently told her sister that she had been confused about Leland's identification, but not that of Defendant. She further testified that, despite all of the identification issues, she was one-hundred percent certain that the person who pointed a gun at her from inside the house was Defendant.

{5} Defendant contended at trial, and continues to argue on appeal, that Diane's identification was suspect. At trial, Defendant's attorney cross-examined Diane's credibility extensively. During this cross-examination, Defendant's attorney elicited the statements that Diane was taking Demerol, Percoset, and Valium for her migraines and a neck injury around the time of the shooting and that she had described the shooter to the police as five foot, seven inches tall (Defendant is six inches shorter). He also highlighted some of the contradictions in her photo array identifications, statements to police officers, and grand jury testimony. Additionally, Defendant's attorney later called as a witness a former assistant district attorney, who initially worked the case until she resigned from her position to run for District Attorney. She testified that Diane's sister had called her and told her that Diane now thought that it was Ricky, not Defendant, who was at the scene of the crime. She further testified that she met with Diane and her sister and that Diane was very confused about her identifications. Finally, she testified that when Leland Martinez was to be released based on an informant's tip that Defendant and Ricky had confessed to him that they had committed the murder, Diane was adamant that Leland was there. Diane denied this testimony during her direct examination; she remembered talking to her sister about her confusion concerning Leland, but not Defendant. She also denied ever talking to the assistant district attorney.

{6} The State also called Ernesto Roybal—no relation to Defendant—to testify. Ernesto testified that on the night before the killing, Defendant told him that he was going to "come into some drugs." Ernesto further testified that a month after the killing he hid Defendant at his house and that Ricky would also periodically stay with them. Most importantly, Ernesto testified that Ricky told him that he and Defendant had killed the victim. Ricky slashed the victim's throat, and Defendant hit him with a barbell after he was dead. Ernesto further testified that Defendant told him that Ricky had insisted on committing the murder on that day because Defendant had already accepted half of the payment, and the two were concerned that the drug dealers who ordered the murder would kill them. They had been paid in drugs.

{7} Ernesto testified that Ricky and Defendant told him that they passed by the house twice before going in and that they saw a woman hanging clothes as they passed by the house. Defendant told Ernesto that Defendant and Ricky got into an argument at the victim's house about whether they should shoot the victim as they had planned, or cut his throat instead. Defendant and Ricky also told Ernesto that they took the victim's wallet and the drugs that he was carrying and cut off his ear to prove that they had completed the job. Finally, Ernesto testified that Defendant told him that he and Ricky planned on having the car primed and painted, but that it was burnt instead; Defendant was upset about that. Ernesto testified that the police "swarmed" him at a Wal–Mart in Española, forcibly captured him, and escorted him to the police station where they took his statement. He also testified that the police told him that Defendant had tipped them off that he had stayed with Ernesto and they were going to charge him with harboring and aiding and abetting. They made no promises to him about not charging him in exchange for testifying.

{8} Again, Defendant's counsel took pains to discredit this witness. On direct examination Ernesto admitted that he was an ex-felon and used heroin and cocaine. Although he had been clean for sixty-five days, he was incarcerated for that time period. He also admitted on cross-examination that he was angry with Defendant when the police told him that Defendant had tipped them off. Ernesto testified on cross that he knew that harboring a felon was a crime, see NMSA 1978, § 30–22–4 (1963), that he had in fact committed that crime by taking in Defendant and Ricky, and that he did not want to return to prison. Defense counsel confronted him with contradictions between his initial statement and his testimony concerning the length of time Defendant and Ricky had stayed with him. Ernesto denied receiving favorable treatment for his testimony, but he admitted that he has never been charged with harboring a felon. He also admitted on direct examination that he had given information to the police on drug cases in the past in order to avoid paying parking tickets.

{9} Finally, the State presented evidence that the black car that Diane identified as going up to the house and in which she saw Defendant and Ricky leave belonged to Defendant's girlfriend. Defendant addressed this evidence in his case-in-chief. Defendant testified that, using his girlfriend's car, he drove his brother and himself to a birthday party for their incarcerated mother at 11:00 a.m. on the day of the murder. This car was his and his girlfriend's only car; he had put a lot of work into it, and they never lent it out. His brother kept asking for the keys to the car, but Defendant did not give them to him. Using a key hidden in the frame of the car Ricky stole the car, and Defendant and his family did not know where he was for several hours. Later, the family heard a rumor that there was a homicide. When Defendant heard that the victim was Nicky and that his own girlfriend's car was found burnt, he knew that Ricky was involved. Defendant then stayed with his sister at her house, in fear of his brother and of being blamed for the murder. This testimony was corroborated by three members of his family, who all testified that they saw him at the party the entire night of the murder but that Ricky had left for several hours at some point. Defendant further testified that he did not know Ernesto Roybal very well, and only went over to his house once to tattoo Ernes-

to, Ernesto's wife, and their daughter's boyfriend.

## B.

{10} Before trial, the State filed a motion in limine seeking a ruling that it would be allowed to cross-examine Defendant with his prior felony convictions, including one for murder. In 1987 Defendant was convicted of second degree murder, armed robbery, and conspiracy to commit armed robbery in what was locally known as the "Laundromat Killings." In its motion the State argued that under Rule 11–609(A)(2) NMRA 2002 and *State v. Day*, 94 N.M. 753, 755, 617 P.2d 142, 144 (1980), Defendant's convictions for armed robbery and conspiracy should be admitted as crimes involving dishonesty. Additionally, the State argued that the factors for the use of Defendant's murder conviction, as a crime not involving dishonesty, are found in *State v. Lucero*, 98 N.M. 311, 313, 648 P.2d 350, 352 (Ct.App.1982). Using this analysis, the State argued that it should be able to cross-examine Defendant with the murder conviction. Defendant did not file a written response to this motion but argued against it at a hearing conducted on January 29, 2001.

{11} At that hearing, the court told the parties that it had a policy of "only allow[ing] prior felonies to be discussed just as felonies, unless they go to truthfulness." The trial court ultimately disagreed with the State and ruled that if Defendant took the stand, the jury could only be told that Defendant had been convicted of armed robbery and two other felonies, without elaborating what those felonies were. The trial court based its ruling on Rule 11–403 NMRA 2002: "I ... find that the ... prejudice by allowing the murder prior conviction to come out outweighs any probative value for it on the issue on credibility." The trial court later explained where it identified the prejudice:

> I am convinced on what I know of your arguments as to what the factual situation here is going to be that credibility is going to be an important issue and truthfulness and therefore the probative value of the armed robbery on the issue of whether Mr. Roybal is being truthful in his testimony, in my opinion outweighs the prejudice of

letting that in, and then I come to the opposite conclusion on the murder conviction.

{12} During the same hearing the parties discussed a statement Ricky had made to the police confessing the crime and stating that Defendant was not involved. Because Ricky had committed suicide in prison a couple of weeks earlier, both the State and Defendant wanted to admit into evidence the taped confession and a translated transcription prepared by Agent Joe Martinez. Defendant agreed that the statement was admissible as a statement against penal interest, *see* Rule 11–804(B)(3) NMRA 2002, but argued that there were problems with some of the translations. Defendant made no other objections concerning the transcript.

{13} At trial, the State introduced the taped confession and sixteen page transcript through the testimony of Agent Joe Martinez. Before its admission, the trial court asked if there were any objections, and defense counsel stated that he would rest on his pretrial objections about the translation. The entire tape was played for the jury after the trial court instructed them to rely on the tape recording if there were any discrepancies between it and the transcript.

{14} After the tape was played and the jury was recessed, defense counsel alerted the court that portions of the confession referred to Defendant's participation in the "Laundromat Killings." He had intended to have those portions redacted but had overlooked that portion of his notes. He claimed that he had been ineffective. He stated that he did not want an instruction to disregard the testimony or a belated attempt to redact the transcripts because he did not want to draw attention to those statements. The trial court agreed that it would draw undue attention to the statements and reiterated its earlier ruling that Defendant could not be cross-examined with the prior murder conviction. The State asserted that it would not refer to that portion of the tape and transcript and agreed with the court when it reiterated its pretrial ruling about the impeachment of Defendant with his prior convictions. The State also pointed out that the jury would be instructed on the limited use of

prior convictions in its deliberation. Before the jury retired to deliberate, defense counsel sought to redact mention of the prior homicide from the transcript, but the trial court declined to do so.

{15} The following statements by Ricky are relevant to this appeal [1]:

> Mr. Roybal: No te estoy mintiendo. Yo que tengo aperder? Pinche (inaudible) madre. Estos dos chavalos. El Greg y el no tiene el corazon para aser un desmadre asina. Si lo trivan por una muerte no, fifteen years old at the laundry mat, accidently shot this fucking clerk. He didn't do that intentionally, I've done everything in my fucking life intentionally. Ok.

> [ * * * ]

> I am not lying to you. What do I have to loose? Asshole (inaudible) mother. This two guys. Greg and him don't have the heart to do this mess. They did have him for murder right, fifteen years old at the laundry mat, accidentally shot this fucking clerk.

Additionally, after the officers told Ricky that Defendant told them that he was at the scene but didn't do any of the cutting, Ricky responded:

> Mr. Roybal: He wasn't there when the killing took place. Understand, Greg is living my shadow all his life, ok.

> Agt. Schiel: Ok.

> Mr. Roybal: If he can get a little bit of publicity or having beat up or double fucking rat ass town can think his a bad dude, that, that his a tough dude that was involved in the killing, even if he was just there, that he ain't going to hurt him, of course his going to do something like that. He's very immature, he spent nine years in prison for a foolish murder. My mother is doing life behind me.

### C.

{16} Defendant filed a motion for a new trial shortly after the jury verdict was filed. Defendant argued that he was entitled to a new trial because an unidentified juror contacted the public defender's office and told a public defender there that the juror had concerns about the jury deliberations. An affidavit by the public defender indicates that this juror stated that the jury was confused by the judge's answer to one of their questions, that based on some of the other jurors' comments, he concluded that they must have read newspaper accounts of the trial, and that the jury considered and discussed Defendant's prior murder conviction. In his motion, defense counsel argued that he was ineffective in failing to redact the references to the murder, and that on the basis of this juror's statements it was clear that the jury considered the prior murder. This, Defendant argued, was extraneous information.

{17} Because the juror was reluctant to reveal his identity to the general public, the trial court took sworn statements from the juror in camera and sealed them. At the hearing on the motion, the court summarized the testimony for the parties. The juror's primary concern was with the jury instruction on accessory liability, which the jury found confusing. Relevant to the ineffective assistance claim, the jury did discuss Defendant's prior murder conviction. The jury, however, was not convinced Defendant was involved in the prior murder, and they followed the instruction not to base their conclusion on it. The court stated, "The record should be clear that they did discuss Mr. Roybal's involvement in the 'Laundromat Killings.'" Defense counsel argued strenuously that the State had an absolute obligation to redact the offensive portions, although he conceded that he was ineffective in failing to have the State redact those portions.

{18} The trial court denied the motion for new trial concluding first, based on its interview with the juror, that the jury did not

---

1. The statements that follow appear as they do in the transcript provided to the jury. The transcript follows the original statements with translations of the original Spanish (Ricky alternated frequently between English and Spanish). For convenience, the translated portions are separated from the original with a line of asterisks, which did not appear in the transcript.

consider any extraneous newspaper articles. Second, the trial court concluded that, because the juror stated that the jury concluded that it was improper to consider the prior murder conviction in its deliberations, the standard for an ineffective assistance of counsel case had not been met. The trial court was more troubled by this later claim, however, because it concluded that all parties, including the court, were under a duty to ensure that the court's orders are followed.

## II.

{19} The framework for evaluating a claim of ineffective assistance of counsel is well established. Following *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), we require Defendant to show, first, that his counsel's performance was deficient and, second, that this deficiency prejudiced his defense. *Lytle v. Jordan*, 2001–NMSC–016, ¶ 25, 130 N.M. 198, 22 P.3d 666. The burden remains with Defendant to establish each element. *Id.* When an ineffective assistance claim is first raised on direct appeal, we evaluate the facts that are part of the record. If facts necessary to a full determination are not part of the record, an ineffective assistance claim is more properly brought through a habeas corpus petition, although an appellate court may remand a case for an evidentiary hearing if the defendant makes a prima facie case of ineffective assistance. *State v. Swavola*, 114 N.M. 472, 475, 840 P.2d 1238, 1241 (Ct.App.1992). In this case, there is no need to remand the case because all of the facts necessary to evaluate the claim are part of the record on appeal. Unlike the defendant who claims, for example, that his counsel failed to adequately investigate, in this case Defendant complains that his counsel failed to redact portions of Ricky's confession; the alleged deficiency and the claimed prejudice all occurred on the record at trial.

{20} This case presents a preliminary question raised by the trial court's in camera interview with the juror. On appeal Defendant argues that, under Rule 11–606(B) NMRA 2002, we can consider the juror's statement that they considered the prior murder, but that we should disregard the statement related by the judge that the jury was unsure whether Defendant had in fact committed the prior murder and therefore did not make much of the evidence. Rule 11–606(B) provides,

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

We agree with Defendant that we should not consider the statements about the jury's use of the prior murder conviction because they constitute statements "to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith." We need not, however, decide whether the juror's statement that the jury considered the prior murder conviction is one concerning "extraneous prejudicial information" that "was improperly brought to the jury's attention" and can thus be considered under the rule, because we will presume that the jury considered all of the evidence that was presented to it, including this evidence that it should not have heard.

### A.

{21} Defense counsel's performance is deficient if " 'counsel's representation fell below an objective standard of reasonableness.' " *Lytle*, 2001–NMSC–016, ¶ 26, 130 N.M. 198, 22 P.3d 666 (quoting *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052). In

determining whether a particular counsel's performance was deficient, an appellate court should presume that the performance fell within a " 'wide range of reasonable professional assistance.' " *Id.* (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052). Indeed, if on appeal we can conceive of a reasonable trial tactic which would explain the counsel's performance, we will not find ineffective assistance.

{22} The narrow issue presented by this appeal is whether the failure to redact the two statements referring to Defendant's prior murder conviction was ineffective; that the statement as a whole was generally favorable to Defendant may lessen the prejudice felt by Defendant, but it does not alter the question of whether it was ineffective to fail to redact the troublesome references. There is little question in this case that Defendant's counsel's performance was deficient when he failed to move to redact the references to the prior murder. The fact that, on the whole, the statement exculpated Defendant does not change this conclusion.

{23} We cannot say that counsel decided not to object to the presentation of evidence because it was beneficial to his case. *Contra Swavola*, 114 N.M. at 475, 840 P.2d at 1241 ("After all, acquiescence to the introduction of inadmissible evidence may sometimes be tactically advantageous."). In this case, Defense counsel did intend to introduce the statement as a whole. What he did not want the jury to hear, and was ineffective in failing to redact so that they did not hear, were the two portions of that statement that mention his client's prior murder conviction. We can conceive of no reasonable trial tactic to explain this failure.

{24} Nor is this a case where defense counsel did not renew at trial an objection he lost in limine. *Cf. State v. Richardson*, 114 N.M. 725, 728, 845 P.2d 819, 822 (Ct.App. 1992) ("We reject Defendant's contention that, although the motion lacked merit, defense counsel fell below the standard of a reasonable attorney for failing to renew the motion at trial."). Indeed, in this case nearly the opposite occurred: Defendant's counsel successfully resisted the district attorney's motion in limine to be entitled to cross-examine Defendant with his prior murder conviction and secured a pretrial ruling that evidence of the prior murder conviction would be more prejudicial than probative. Defense counsel, however, failed to ensure that this pretrial ruling was applied to Ricky's statement. We are convinced that there is no rational trial strategy that would explain the failure to redact portions of Ricky's statement based on that pretrial ruling and that counsel's failure to do so fell below an objective standard of reasonableness. *Cf. Stone v. Texas*, 17 S.W.3d 348, 353 (Tex.App.2000) (finding the defense counsel's performance deficient when, after a pretrial ruling that his client's prior convictions were not admissible at the guilt-innocence phase of trial, he began the direct examination of the defendant by eliciting testimony about those convictions).

### B.

{25} Less clear, however, is the question of prejudice. Under the *Strickland* measure of ineffective assistance of counsel, mere evidentiary prejudice is not enough. Counsel's deficient performance must represent so serious a failure of the adversarial process that it undermines judicial confidence in the accuracy and reliability of the outcome. The right to effective assistance of counsel thus exists to protect the due process right to a fair trial. *See Strickland*, 466 U.S. at 684–85, 104 S.Ct. 2052. Thus, even if counsel's performance is deficient, Defendant is not entitled to a new trial unless, considering the totality of the evidence, a reviewing court determines that there is " 'a reasonable probability that, absent the errors, the fact-finder would have had a reasonable doubt respecting guilt.' " *Lytle*, 2001–NMSC–016, ¶ 27, 130 N.M. 198, 22 P.3d 666 (quoting *Strickland*, 466 U.S. at 695, 104 S.Ct. 2052). In this context, a "reasonable probability" is one " 'sufficient to undermine confidence in the outcome.' " *Id.* (quoting *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052).

{26} There are two sources of prejudice in this case. First, because Defendant took the stand and presented an alibi defense, his credibility was an important issue at trial. The evidence that he had committed a prior murder undoubtedly prejudiced him in this

regard. Second, because Defendant was on trial for murder, evidence that he had committed a prior murder invites the impermissible inference that, because he had killed in the past, it is more likely that he committed this murder. In this case we must compare the weight of this prejudice against the totality and strength of the evidence of Defendant's guilt and determine if the outcome of the trial has been rendered unreliable.

{27} This second source of prejudice was mitigated when the court, following UJI 14–5022 NMRA 2002, instructed the jury that, "Evidence has been admitted that the defendant was convicted of the crimes of armed robbery and two other felonies. You may consider such evidence for the purpose of determining whether the defendant told the truth when he testified in this case and for that purpose only." The jury is presumed to have followed this instruction, *State v. Gonzales*, 113 N.M. 221, 230, 824 P.2d 1023, 1032 (1992), and on a claim of ineffective assistance of counsel, we will not assume that the jury indulged in an impermissible inference in order to find prejudice sufficient to undermine our confidence in the outcome. *Strickland*, 466 U.S. at 695, 104 S.Ct. 2052 ("The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision.").

{28} To evaluate the scope of the prejudice Defendant suffered to his credibility, we must bear in mind that under the trial court's pretrial ruling, the jury would have heard that Defendant was convicted of armed robbery and two other felonies. Thus, the prejudice under our cases is any additional damage to Defendant's credibility caused by his counsel's error. That prejudice is the additional information that one of Defendant's other two felony convictions was a conviction for murder. We must also bear in mind the context in which the two statements are found. The sixteen page transcript of Ricky's confession generally exculpates Defendant. In it Ricky expressly confesses to the crime and says that he was helped by a friend in California. He told the police that they had two innocent people in jail—Defen-

dant and Leland Martinez. Even the statements that refer to Defendant's participation in the prior murder are surrounded by claims that Defendant does not have the heart for murder. Undoubtedly, these statements were prejudicial, and the trial court was correct in ruling before trial that under Rule 11–403 mention of the previous murder would be more prejudicial than probative. That, however, is not the test. The statements viewed in this light, and compared to the significant evidence of Defendant's guilt, do not make the reliability of the trial suspect and do not deprive Defendant of his due process right to a fair trial. We therefore hold that Defendant has not met his burden to establish ineffective assistance of counsel.

{29} As described above, the State presented three main pieces of information connecting Defendant to the crime: the eyewitness testimony of Diane Martinez, the confession by Defendant given to and admitted through Ernesto Roybal, and the fact that the car identified at the scene of the crime belonged to Defendant's girlfriend. Defendant relied upon his alibi story, which was corroborated by various members of his family. Defendant also attempted to discredit Diane Martinez and Ernesto Roybal and provided an explanation of why his car was seen at the scene of the crime. Not surprisingly, in each brief to this Court the State and Defendant characterize the evidence, respectively, as "quite strong" and "resting on the shaky foundation of an extremely dubious identification and the claim of an untrustworthy character who thought [Defendant] had ratted him out." The trial record supports the State's characterization, and we thus conclude that Defendant has not established that the result of the trial would have been any different absent his counsel's error. The cumulative effect of these three items of evidence, even considering Defendant's efforts to discredit them, are simply too strong for us to conclude otherwise.

{30} On appeal, Defendant relies heavily upon *Stone*, 17 S.W.3d 348. In that case, the defendant, on trial for delivery of a controlled substance, objected when the prosecutor had hinted at the defendant's prior convictions

during voir dire. *Id.* at 352. As a result, the trial court issued a pretrial ruling that defendant's prior convictions would not be mentioned during the guilt-innocence phase of the trial, but could be proved during sentencing to establish an enhanced punishment. *Id.* at 352–53. Inexplicably, the defendant's lawyer began his direct examination of the defendant by eliciting testimony about his prior murder conviction. *Id.* at 351–52. The Texas Court of Appeals found that the defendant had received ineffective assistance and was prejudiced because (1) it diminished his credibility, which was essential to establishing his alibi defense, and (2) it "gave substance" to the undercover agent's testimony that the defendant had threatened to kill her if she was a police officer. *Id.* at 353.

{31} We conclude that *Stone* is distinguishable. In that case, had counsel ensured that the pretrial order was followed, the jury would have heard no mention of his criminal past. In this case, by contrast, the jury would still have known that Defendant had been convicted of armed robbery and two other felonies. Thus, the prejudice felt in this case is less than in *Stone*. Additionally, in *Stone* the defense lawyer asked the defendant about each of prior convictions directly and on the stand. In this case, the mention of the prior murder came obliquely in an out-of-court statement generally favorable to Defendant and surrounded by assurances that Defendant does not have the heart for this kind of crime. Neither the State nor Defendant referred to those statements at any point in the trial.

{32} We are mindful of the admonition in *Stone* that "[o]ne should be tried for only the crime for which he is indicted, and not for being a criminal generally." *Id.* at 353–54. We are certain that our rules of evidence would normally operate to prevent the jury from hearing of Defendant's prior involvement in a murder. Defendant, however, argues that his counsel was ineffective in failing to redact those two statements and that, as a result of this deficiency, there is a reasonable probability that the result of the trial would have been different. While we agree that Defendant's counsel " 'fell below an objective standard of reasonableness,' "

*Lytle*, 2001–NMSC–016, ¶ 26, 130 N.M. 198, 22 P.3d 666 (quoting *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052), we conclude that Defendant has not established prejudice sufficient to warrant a new trial.

### III.

{33} Defendant next argues that the cumulative effect of the oversight of his counsel, the prosecutor, and the trial court deprived him of a fair trial. The doctrine of cumulative error applies when multiple errors, which by themselves do not constitute reversible error, are so serious in the aggregate that they cumulatively deprive the defendant of a fair trial. *State v. Baca*, 120 N.M. 383, 392, 902 P.2d 65, 74 (1995). The doctrine is to be strictly applied, *State v. Woodward*, 121 N.M. 1, 12, 908 P.2d 231, 242 (1995), and should not apply where, as in this case, Defendant only complains of one error but attributes multiple sources to its cause and where Defendant had a fair trial.

### IV.

{34} Defendant established that his counsel's performance was deficient when he failed to redact portions of Ricky's confession that referred to Defendant's prior participation in the "Laundromat Killings." Defendant failed to establish, however, that there is a reasonable probability that the jury would have had a reasonable doubt concerning his guilt as a result. Because Defendant only complains of one error at trial, we reject his cumulative error claim. We therefore affirm his convictions.

{35} **IT IS SO ORDERED.**

WE CONCUR: PATRICIO M. SERNA, Chief Justice, PETRA JIMENEZ MAES, Justice.

GENE E. FRANCHINI, Justice (dissenting).

FRANCHINI, Justice (dissenting).

{36} I respectfully dissent from Section II(B) of the majority opinion which concludes that although "Defendant's counsel 'fell below an objective standard of reasonableness,' ... Defendant [had] not estab-

lished prejudice sufficient to warrant a new trial." Majority opinion ¶ 32. I agree with the majority opinion that "Defendant's counsel 'fell below an objective standard of reasonableness.'" *Id.* However, I believe Defendant suffered prejudice sufficient to warrant a new trial when Ricky's un-redacted taped confession made reference to Defendant's involvement with a prior murder.

{37} The district court granted Defendant's motion in limine, pursuant to Rule 11–403 NMRA 2002, concluding that reference to Defendant's involvement in another murder "outweighs any probative value for it on the issue of credibility." Majority opinion ¶ 11. In granting Defendant's motion, the district court explained:

> I am convinced on what I know of your arguments as to what the factual situation here is going to be that credibility is going to be an important issue and truthfulness and therefore the probative value of the armed robbery on the issue of whether Mr. Roybal is being truthful in his testimony, in my opinion outweighs the prejudice of letting that in, and then I come to the opposite conclusion on the murder conviction.

*Id.* The district court clearly held in a pre-trial ruling that reference to the prior murder conviction was prejudicial to Defendant. In failing to redact the portions of Ricky's confession that referred to the earlier murder and denying Defendant's motion for a new trial, the district court essentially reversed its pre-trial ruling to exclude this information.

{38} The risk of prejudice from a jury hearing evidence that a defendant has an earlier criminal conviction is that the jury may infer that because he committed a crime previously, he probably committed the crime for which he is on trial. Rule 11–404(B) NMRA 2002. The risk is greatest when, as here, the crime charged and the prior conviction involve the same offense. Greg Roybal was on trial for murder in the first degree and the jury convicted him of that crime. The evidence admitted here is precisely the kind of evidence that should not be allowed under Rule 403 for the very reason that actual prejudice is unavoidable.

{39} The majority believing otherwise, I respectfully dissent.