STATE V. PALMER

This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports.  Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions.  Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

**STATE OF NEW MEXICO,**
**Plaintiff-Appellee,**
**v.**
**BRIAN HARRIS PALMER,**
**Defendant-Appellant.**

Docket No. A-1-CA-35160
COURT OF APPEALS OF NEW MEXICO
May 7, 2019

APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY, Charles W. Brown, District Judge

**COUNSEL**

Hector H. Balderas, Attorney General, Maris Veidemanis, Assistant Attorney General, Santa Fe, NM for Appellee

Kennedy, Hernandez & Associates, P.C., Paul J. Kennedy, Arne R. Leonard, Elizabeth A. Harrison, Albuquerque, NM for Appellant.

**JUDGES**

M. MONICA ZAMORA, Chief Judge. WE CONCUR:  JULIE J. VARGAS, Judge, JENNIFER L. ATTREP, Judge

**AUTHOR:** M. MONICA ZAMORA

**MEMORANDUM OPINION**

**M. ZAMORA, Chief Judge.**

**{1}**     Brian Harris Palmer (Defendant) appeals his convictions and sentencing for criminal sexual penetration in the second degree (CSP II) and kidnapping, contrary to NMSA 1978, Section 30-9-11(E)(3) (2009), and NMSA 1978, Section 30-4-1(A)(4) (2003), respectively. Defendant challenges his convictions on the following grounds: (1) double jeopardy; (2) insufficient evidence of CSP II and kidnapping; (3) undue restriction

on his right to confront an adverse witness; (4) ineffective assistance of counsel; and (5) cumulative error. We affirm.

**BACKGROUND**

**{2}** Victim testified that, on the evening of June 6, 2014, around 7:20 p.m., she went for a walk after work in the area of San Mateo and Montgomery on a route that she regularly walked because it was well-lit and the stores are always open. She also testified that one block north of that intersection, a man assaulted her. That evening, she walked past a man waiting at a bus stop, who was bent down to talk to someone waiting for the bus. As she "got to the [red] light that was on the path to turn down toward Walgreens," she felt like someone was following her or walking behind her. That person got closer to her, "[a]n arm's length, maybe," and said "hi" to her. In her testimony, she described the man as "about 5'8", more or less. He looked like he was drugged or was drunk. . . . [A]t that moment when he said hello to me and I turned around and I saw him, I was scared because it was the same person who I saw at the bus stop." The light changed, and Victim began to cross the street, with the man walking at her side.

**{3}** At trial, Victim described that as soon as she had crossed the street, "this person grabbed me [from behind] and—grabbed me, hugged me, and held my arms up." Then, she testified that while still being held by him, "[t]his person took a few more steps and then he turned around where that sign is going down into the parking lot." She testified that, after that, "he threw me down to the ground and then he put himself on top of my legs." The man then "pull[ed] down my clothing and my pants, including my underclothes, and he got on top of my legs. . . . His knees were on each side of mine and he was pressing my legs with his." Then, she testified, "He was touching my private parts. He was trying to do it many times." "[W]ith his right hand, he had put his [fingers] in [Victim's] vagina." When asked whether his fingers went inside her vagina, she said, "[n]ot all the way, but he did touch the entrance of my vagina." Victim saw some shrubs and rocks, and "threw the rocks in his face," pushed him, and after he got off of her, the man "walked off to the parking lot." Victim got up, pulled up her pants, began yelling for help, and called 911.

**{4}** A nearby taxi driver heard Victim's screams for help and assisted her. The taxi driver, along with an on-site security guard and Victim, followed Defendant, who was on foot, for a few blocks until police arrived. Victim positively identified Defendant at the scene as the man who attacked her while he sat on the curb in handcuffs. Victim testified that her left hand was injured as a result of the assault, stating, "I imagine that while I was looking for something to defend myself, that I hurt myself on the shrubs or some rocks."

**{5}** The jury returned a verdict of guilty as to criminal sexual penetration causing personal injury (CSP II) and kidnapping. In response to the three special verdict questions related to kidnapping, the jury found that Defendant: (1) did not voluntarily free Victim in a safe place, (2) inflicted physical injury upon Victim, and (3) committed a

sexual offense upon Victim. Defendant was sentenced to eighteen years' imprisonment for kidnapping and nine years for CSP II, to run concurrently. Because this is a memorandum opinion and the parties are familiar with the facts and procedural history of this case, we reserve discussion of additional pertinent facts for our analysis.

**DISCUSSION**

**I.      Defendant's Convictions for Both Kidnapping and CSP II Do Not Violate the Prohibition Against Double Jeopardy**

**{6}**      "Double jeopardy presents a question of law, which we review de novo." *State v. Sotelo*, 2013-NMCA-028, ¶ 18, 296 P.3d 1232 (internal quotation marks and citation omitted). "However, where factual issues are intertwined with the double jeopardy analysis, we review the trial court's fact determinations under a deferential substantial evidence standard of review." *State v. Rodriguez*, 2006-NMSC-018, ¶ 3, 139 N.M. 450, 134 P.3d 737.

**{7}**      Defendant was charged with CSP II. In order to prove that charge, the State was required to show in relevant part that "[D]efendant caused the insertion to any extent, of his finger, into the vagina or vulva of [Victim,]" he "used physical force or physical violence[,]" and his "acts resulted in abrasions to [Victim's] left hand[.]" *See* UJI 14-949 NMRA; *see also* § 30-9-11(E)(3). Defendant was also charged with kidnapping, which requires proof that "[D]efendant took, restrained, [or] confined [Victim] by force, intimidation or deception[,]" and "[D]efendant intended to hold [Victim] against her will to inflict death, physical injury or a sexual offense on [Victim.]" *See* UJI 14-403 NMRA (1997);[1] *see also* § 30-4-1(A)(4). Defendant argues that the jury relied on the same force or restraint to support his convictions for CSP II and kidnapping, violating his right to be free from double jeopardy.

**{8}**      The United States and New Mexico Constitutions both prohibit any person from being "twice put in jeopardy" for the same offense. U.S. Const. amend. V; N.M. Const. art. II, § 15. The double jeopardy prohibition against multiple punishments "relates to two general categories of cases in which a defendant has been charged with multiple violations of a single statute based on a single course of conduct, known as 'unit of prosecution' cases; and cases in which a defendant is charged with violations of multiple statutes for the same conduct, known as 'double-description' cases." *State v. DeGraff*, 2006-NMSC-011, ¶ 25, 139 N.M. 211, 131 P.3d 61. Because Defendant argues that his convictions arise from the same conduct, charged under different statutes, this is a double-description case. For "double[-]description" cases, we apply the two-part test set forth in *Swafford v. State*, 1991-NMSC-043, ¶ 9, 112 N.M. 3, 810 P.2d 1223, and decide: (1) whether the conduct is unitary and (2) if so, whether the Legislature intended to punish the offenses separately. "Only if the first part of the test is answered in the affirmative, and the second in the negative, will the double jeopardy

---

1 We note that UJI 14-403 was amended in 2015 to add an element requiring the jury to find that the "restraint . . . was not slight, inconsequential, or merely incidental to the commission of another crime" where there is a genuine issue of incidental conduct. See UJI 14-403 use note 8 (2015); *see also* UJI 14-403 comm. cmt. (2015).

clause prohibit multiple punishment in the same trial." *State v. Silvas*, 2015-NMSC-006, ¶ 9, 343 P.3d 616 (internal quotation marks and citation omitted).

**{9}**    "When determining whether [a d]efendant's conduct was unitary, we consider whether [the d]efendant's acts are separated by sufficient indicia of distinctness." *DeGraff*, 2006-NMSC-011, ¶ 27 (internal quotation marks and citation omitted). "Conduct is unitary when not sufficiently separated by time or place, and the object and result or quality and nature of the acts cannot be distinguished." *Silvas*, 2015-NMSC-006, ¶ 10. "In our consideration of whether conduct is unitary, we have looked for an identifiable point at which one of the charged crimes had been completed and the other not yet committed." *DeGraff*, 2006-NMSC-011, ¶ 27. "The proper analytical framework for determining unitary conduct is whether the facts presented at trial establish that the jury reasonably could have inferred independent factual bases for the charged offenses." *State v. Dominguez*, 2014-NMCA-064, ¶ 12, 327 P.3d 1092 (alteration omitted) (quoting *State v. Franco*, 2005-NMSC-013, ¶ 7, 137 N.M. 447, 112 P.3d 1104). "[T]he task is merely to determine whether the conduct for which there are multiple charges is . . . distinguishable." *Swafford*, 1991-NMSC-043, ¶ 28.

**{10}**    During trial, after the close of the State's evidence, Defendant moved for a directed verdict as to the kidnapping charge. The district court concluded, "I think the evidence is,[] someone came up, grabbed [Victim] and threw her, forced her, or pushed her, or whatever, however you want to characterize it, down on the rocks there in the bushes." Then, "that same person then pulled her pants down and either did or attempted to penetrate her digitally." In denying Defendant's motion, the court stated that "[t]he kidnapping was complete at the time she was restrained or confined illegally." We agree.

**{11}**    Here, the conduct underlying Defendant's convictions for kidnapping and CSP II is not unitary because independent factual bases support each offense. The record establishes that the underlying acts for the two charges, while close in time and place, occurred in different places: the kidnapping occurred on the sidewalk, whereas the CSP II occurred on the landscaped area next to the sidewalk and in front of the business sign. In addition, the nature of the physical force and restraint for each crime was different. The kidnapping occurred when Defendant grabbed Victim from behind, hugged her, and held her hands up. Defendant used separate physical force in the commission of the CSP II: he put himself on top of Victim lower legs, pulled her pants down, and then put his knees on either side of her legs while pressing down on her legs with his. On these facts, a jury reasonably could have concluded that the kidnapping was complete, and therefore factually distinct, at the point Defendant grabbed and hugged Victim and held her arms up. *See State v. McGuire*, 1990-NMSC-067, ¶ 10, 110 N.M. 304, 795 P.2d 996 ("Once [the] defendant restrained the victim with the requisite intent to hold her for service against her will, he had committed the crime of kidnapping, although the kidnapping continued throughout the course of [the] defendant's other crimes[.]"); *see also Dominguez*, 2014-NMCA-064, ¶ 10 ("The crime of kidnapping is complete when the defendant, with the requisite intent, restrains the victim, even though the restraint continues through the commission of a separate crime." (citing *McGuire*,

1990-NMSC-067, ¶ 10)). The fact that the statutes share the element of force is not dispositive of our inquiry. *See Dominguez*, 2014-NMCA-064, ¶ 10; *see also State v. Allen*, 2000-NMSC-002, ¶ 70, 128 N.M. 482, 994 P.2d 728 ("Similar statutory provisions sharing certain elements may support separate convictions and punishments where examination of the facts presented at trial establish that the jury reasonably could have inferred independent factual bases for the charged offenses." (alteration, internal quotation marks, and citation omitted)).

**{12}** Defendant nevertheless argues that even if separate conduct supported both convictions, the jury instructions did not adequately differentiate the conduct supporting the CSP II charge from the kidnapping charge. Defendant, citing our holding in *State v. Montoya*, states that we must therefore presume that his kidnapping and CSP II convictions are based upon the same evidence of force and restraint. *See* 2011-NMCA-074, ¶ 39, 150 N.M. 415, 259 P.3d 820. We disagree.

**{13}** In *Montoya*, the defendant was convicted of kidnapping and CSP II based on sexual intercourse that occurred during the commission of either kidnapping or aggravated burglary. *Id.* ¶ 35. On appeal, the defendant argued "that his constitutional protection against double jeopardy was violated because he was convicted of both CSP II (commission of a felony) and the predicate felony underlying the CSP II conviction." *Id.* ¶ 28. We determined that the conduct underlying the defendant's convictions in *Montoya* was unitary. *Id.* ¶ 39.

**{14}** Here, unlike *Montoya*, the sexual assault charge did not require the jury to find that the offense was committed *during* the commission of kidnapping, and we do not harbor any similar concern that Defendant's convictions were based upon the same predicate conduct. The evidence in this case demonstrates that Defendant's acts were separated by sufficient indicia of distinctness and that the kidnapping was complete before Defendant subsequently used force to commit CSP II. *See Allen*, 2000-NMSC-002, ¶ 70 ("[I]f there was a basis for the jury to find factually distinct bases for kidnapping [and] attempted CSP, . . . then the conduct is considered non-unitary."). We will not second-guess the jury's factual conclusions. *See State v. Urioste*, 2011-NMCA-121, ¶ 28, 267 P.3d 820 (affirming on the basis "that the jury could reasonably have inferred an independent factual basis for all three of [the d]efendant's convictions, and we do not second-guess the factual conclusions of a jury"). Because we conclude that Defendant's conduct was not unitary, we do not proceed to the second *Swafford* prong, and we conclude that no double jeopardy violation occurred here.

## II. Defendant's Convictions Were Supported by Sufficient Evidence

**{15}** "In reviewing sufficiency of the evidence, we must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Holt*, 2016-NMSC-011, ¶ 20, 368 P.3d 409 (internal quotation marks and citation omitted). "In that light, the Court determines whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (internal quotation marks and citation

omitted). "Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the d]efendant's version of the facts." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. "Jury instructions become the law of the case against which the sufficiency of the evidence is to be measured." *State v. Jackson*, 2018-NMCA-066, ¶ 22, 429 P.3d 674 (internal quotation marks and citation omitted), *cert. denied*, 2018-NMCERT-___ (No. S-1-SC-37267, Oct. 15, 2018).

## A.    Kidnapping

**{16}**    To find Defendant guilty of kidnapping, the jury had to find that Defendant: (1) took, restrained, or confined Victim by force, intimidation, or deception; (2) and intended to hold Victim against her will to inflict death, physical injury or a sexual offense on her; (3) in New Mexico on or about June 6, 2014. *See* § 30-4-1(A)(4); UJI 14-403.

**{17}**    Defendant argues that the State did not present sufficient evidence of the first element of kidnapping because any restraint by force used to commit the kidnapping was incidental to the force used to commit the sexual offense. *See State v. Trujillo*, 2012-NMCA-112, ¶ 39, 289 P.3d 238 (concluding that evidence of a restraint incidental to an aggravated battery was insufficient to support a conviction for kidnapping). "The appellate courts have held consistently that the evidence of force used in kidnapping must be independent of the evidence of force used in CSP." *Id.* ¶ 11. Similarly, "the Legislature did not intend to punish as kidnapping restraints that are merely incidental to another crime." *Id.* ¶ 39.

**{18}**    Notwithstanding the higher deference afforded to the guilty verdict in a review for sufficiency, we recognize that our sufficiency inquiry overlaps with our analysis of unitary conduct under double jeopardy. *See Dominguez*, 2014-NMCA-064, ¶ 4 ("[O]ur resolution of [d]efendant's double jeopardy argument is largely determinative of his insufficiency of the evidence argument. Indeed in the context of combined kidnapping and sexual offense convictions, these two areas of law have generated considerable analytical overlap in our case law." (citing *Allen*, 2000-NMSC-002, ¶¶ 62, 67)). For the reasons stated in our double jeopardy analysis, we likewise reject Defendant's contention that the force used to convict Defendant of kidnapping was merely incidental to CSP II. In evaluating whether force is incidental, "we must determine whether the force used *during* the other crime, in this case CSP II, is the only evidence of force supporting both the kidnapping conviction and the separate offense." *Id.* ¶ 12. As already discussed, Defendant's initial act of force—grabbing Victim from behind to restrain her *before* sitting on her legs to restrain her during the sexual assault—was not incidental to the force required to commit the CSP II. *See id.* (relying on the conclusion that the defendant's conduct was non-unitary to conclude that "there was evidence of independent uses of force and intimidation before the CSP that supported [the d]efendant's kidnapping conviction" (citing *Allen*, 2000-NMSC-002, ¶ 67)).

**{19}**    Defendant attempts to minimize the significant independence of his acts by arguing that his purpose in restraining Victim was to stop her and descend on the ground on top of her so he could "effect the sexual offense in the most straightforward

manner possible," and that the assault occurred "within a few steps" of the initial grabbing. The separate use of force, however, does not depend on the distance traveled or amount of time that has passed but on the totality of the circumstances. *See Trujillo*, 2012-NMCA-112, ¶ 43 (stating that a conviction for kidnapping based on "minimal movement or short confinement" would not be precluded by the Court's conclusion because "whether the restraint or movement is incidental depends on the facts of each case, in light of the totality of surrounding circumstances" (internal quotation marks and citation omitted)). Indeed, this Court has previously upheld a conviction for kidnapping that occurred steps away from the sexual assault. *See, e.g.*, *Dominguez*, 2014-NMCA-064, ¶¶ 10, 12 (concluding that the evidence supported independent uses of force and intimidation to support a separate conviction for kidnapping where the defendant first pulled a gun from his clothing and made threats to the victim, moved victim to the back bedroom, and then used the gun to restrain her during the CSP). Considering the facts and circumstances presented at trial in the light most favorable to the verdict, we conclude that there was sufficient evidence of force, independent of the force used during the CSP II, to support Defendant's kidnapping conviction. *See id.* ¶ 12 (concluding that, "[u]nder no reading of *Trujillo* would [the d]efendant's force . . . in effectuating the initial restraint supporting the kidnapping conviction be considered 'merely incidental' to the CSP II as a matter of law, nor was it the type of force 'necessarily involved' in every CSP" (citation omitted)).

**{20}** We decline to consider Defendant's additional arguments related to the sufficiency of the evidence for his kidnapping conviction based upon Victim's physical injuries as these arguments are inadequately developed and Defendant cites no authority in support of his position. *See State v. Guerra*, 2012-NMSC-014, ¶ 21, 278 P.3d 1031 (stating that the appellate courts are under no obligation to review unclear or undeveloped arguments).

## B.    CSP II

**{21}** To find Defendant guilty of CSP II, the jury had to find (1) Defendant caused the insertion to any extent of his finger into Victim's vulva or vagina; (2) he used physical force or physical violence; (3) his acts resulted in abrasions to Victim's left hand; (4) and he acted unlawfully; (5) in New Mexico on or about June 6, 2014. *See* § 30-9-11(E)(3); UJI 14-949. Vulva was defined in the jury instructions as "the external parts of the female organ of sexual intercourse. It is composed of the major and minor lips, the clitoris and the opening of the vagina." UJI 14-981 NMRA.

### 1.    Injury

**{22}** Defendant argues that there is insufficient evidence to support the third element of this charge because Victim testified that she imagined she hurt herself on the shrubs or rocks while looking for something to defend herself, rather than as a result of Defendant's use of force. The State responds that Victim's injury to her hand is sufficient to support the conviction because it occurred as a result of the sexual assault. We agree.

**{23}**   Defendant first argues that the injury must be caused by him through his use of force and not as a result of Victim's resistance to the attack. The sole case cited by Defendant, *State v. Barraza*, does not stand for the proposition he argues, and we will not consider propositions that are unsupported by citation to authority. *See* 1990-NMCA-026, ¶ 11, 110 N.M. 45, 791 P.2d 799 (holding that there was sufficient evidence to support jury's verdict of CSP II where the victim's personal injury was proved by establishing she suffered mental anguish); *see also State v. Vigil-Giron*, 2014-NMCA-069, ¶ 60, 327 P.3d 1129 ("[A]ppellate courts will not consider an issue if no authority is cited in support of the issue and that, given no cited authority, we assume no such authority exists[.]").

**{24}**   Defendant, focusing on Victim's use of the word "imagine," also argues that Victim's testimony is insufficient to establish that Defendant's acts resulted in injury to Victim. Defendant takes Victim's testimony out of context. Victim testified that she received injuries to her hand and back as a result of the assault. When asked, "Do you know what happened to your hand to get that injury?" Victim testified, "I imagine that while I was looking for something to defend myself, that I hurt myself on the shrubs or some rocks." Both Victim and the sexual assault nurse testified that Victim did not have these abrasions prior to the sexual assault. Victim testified that she has a permanent scar resulting from the abrasions on her left hand. Here, the jury instructions required only that the jury find that Defendant's acts resulted in the abrasions. *See* NMSA 1978, § 30-9-10(D) (2005) (defining "personal injury" as "bodily injury to a lesser degree than great bodily harm and includes, but is not limited to, disfigurement, mental anguish, chronic or recurrent pain, pregnancy or disease or injury to a sexual or reproductive organ"); *Jackson*, 2018-NMCA-066, ¶ 2 ("Jury instructions become the law of the case against which the sufficiency of the evidence is to be measured." (internal quotation marks and citation omitted)). Viewing the evidence in the light most favorable to the verdict, a rational jury could find beyond a reasonable doubt that Victim suffered injury to her left hand as a result of Defendant's actions. *See Rojo*, 1999-NMSC-001, ¶ 19 ("Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion.").

## 2.    Penetration

**{25}**   Defendant also argues that the evidence was insufficient to establish the first element of CSP II, digital penetration, and urges us to remand this case for resentencing under the lesser included offense of criminal sexual contact. Defendant argues that Victim did not mention penetration in her interview with police, only that she was touched at the "opening of the vagina" or the side, and there was no physical evidence of penetration. At trial, Victim testified that Defendant "had put his [fingers] in my vagina." When asked whether his fingers went inside her vagina, she said, "[n]ot all the way, but he did touch the entrance of my vagina."

**{26}**   We first address Defendant's argument that the touching of the opening of the vagina was not a penetration of the vagina. The CSP II statute defines criminal sexual penetration as "the unlawful and intentional . . . causing of penetration, *to any extent*

and with any object, of the genital or anal openings of another[.]" Section 30-9-11(A) (emphasis added); *see* UJI 14-949 use note 6 ("Name the part or parts of the body: i.e., 'vagina', 'penis' or 'anus'. The applicable definition or definitions from [UJI] 14-981 must be given after this instruction."). The jury was instructed to consider penetration of either the vagina or vulva based on the district court's determination that "[r]eading the statute as a whole . . . [i]t's my opinion that any penetration will include penetration between the outer portions and through the vagina. I'm going to let vulva stay in." The jury was instructed on the definition of "vulva" as including "*the opening of the vagina.*" UJI 14-981 (emphasis added)). Because penetration "to any extent" of the vulva is sufficient to support a conviction for CSP II in this case, a rational jury could find beyond a reasonable doubt that Defendant caused a penetration to occur based upon Victim testimony that Defendant's fingers on his right hand touched the entrance of her vagina. *See State v. Tapia*, 2015-NMCA-048, ¶ 9, 347 P.3d 738 ("Applying the definitions of vagina and vulva in light of the requirement that penetration minimally occur to any extent, the testimony given by both victims, and the [physician's assistant who examined victim for evidence of sexual abuse] was sufficient to allow a jury to utilize its fact finding autonomy to find that the [s]tate satisfied its evidentiary burden as to the penetrative element of CSPM.").

**{27}** Second, Defendant points to inconsistent statements Victim gave to law enforcement and the lack of DNA evidence to argue that, at most, a touching on the side of the vagina is sufficient to support criminal sexual contact. Here, the jury was presented with this lesser included offense and rejected it based on the evidence. *See Rojo*, 1999-NMSC-001, ¶ 19 (stating that we will not second-guess the jury's verdict based upon a defendant's contrary theory supporting acquittal because "the jury is free to reject [the d]efendant's version of the facts"). Defendant further argues that the fact that neither Victim's nor Defendant's DNA evidence was found on the other person is dispositive of a lack of penetration and misidentification. This theory was also presented to the jury, along with additional testimony by law enforcement witnesses who observed Defendant "scrubbing" or "washing" his hands in the dirt while he was handcuffed on the curb, which they were concerned could contaminate any evidence of the sexual assault. In addition, the State's DNA expert testified that not every contact results in a transfer of enough DNA to be detected, and in some cases could be washed away or removed through common contact with someone or something else. "[R]esolving all conflicts in the evidence in favor of the verdict[,]" *Holt*, 2016-NMSC-011, ¶ 20, we affirm as to this element of CSP II.

### 3. Identity of perpetrator

**{28}** Defendant further argues that there is insufficient evidence to establish that he was the perpetrator because Victim's and the taxi driver's testimony was inconsistent and based on a mere guess or conjecture, that there was a significant distance between both Victim and the taxi driver and Defendant, and that Victim and the taxi driver were distracted and lost sight of the attacker at various points. Contrary to Defendant's position, the record is filled with evidence of Victim's immediate identification of Defendant after the crime occurred, which is summarized below.

**{29}** Victim's identification of Defendant was based upon direct eyewitness testimony. Victim testified multiple times that she kept constant sight of Defendant, briefly losing sight of him just before he was apprehended by police. She testified that she was on the phone with 911 right after the assault until Defendant was arrested by police, a total of about fifteen minutes. Defense counsel cross-examined Victim regarding her identification of Defendant, confirming that she made it from the inside of the taxicab, at night, at a distance of about three car lengths away from Defendant. Victim admitted that she briefly lost sight of Defendant, but confirmed on re-direct that she saw Defendant several times, "[a]t the bus stop, when he attacked me, face-to-face, those two times . . . [and p]robably four or five times as he was going on his route behind the store[.]"

**{30}** The taxi driver also testified that he gave a description of Defendant to the 911 operator as he and Victim were following Defendant. He also explained that he made eye contact with Defendant from about one hundred feet away and "could see him very clearly." He confirmed that he had no reason to believe he started following a different person after briefly losing sight of Defendant because there were no other people behind the store where Defendant was walking, and because the person he was following was "dressed the same." He further indicated that, although it was getting dark, he had his headlights on.

**{31}** Officer Jon Olguin explained that Defendant became a person of interest in the investigation because "[Victim], the caller, had described [Defendant] in detail, in the call. She had followed him from the point of the incident to where [officers] had apprehended him." Officer Olguin testified that he "asked [Victim] if that was the guy she was following. She had indicated, yes, it was." Laura Martin, the field investigator who arrived on scene, photographed "a close-up of the right side of [Defendant's] face . . . indicating some injuries." And Officer David Sprague testified that he "saw a male subject that precisely matched the description that was provided . . . of a male subject wearing blue jeans, a gray shirt, and a bald head." Taken together, the testimony at trial was sufficient to support the identification of Defendant as the perpetrator.

**{32}** When viewed in the context of the highly deferential standard of review, we conclude that there was sufficient evidence to support the jury's verdict on CSP II. *See Rojo*, 1999-NMSC-001, ¶ 19 (stating that we will not second-guess the jury's verdict based upon a defendant's contrary theory supporting acquittal because "the jury is free to reject [the d]efendant's version of the facts").

### III. The District Court's Exclusion of Evidence of U-Visa on Cross-Examination Was Proper and Did Not Deprive Defendant of His Right to Confront Adverse Witnesses

**{33}** Defendant argues that the district court's exclusion of evidence demonstrating bias concerning Victim's potential U-Visa application was an undue restriction on his right to cross-examine Victim. He further argues that he was prejudiced because the evidence was critical to his defense and very likely to influence the outcome of the trial.

However, the record before us is insufficient to permit our review. *See* Rule 11-103(A)(2) NMRA (providing that "[a] party may claim error in a ruling to . . . exclude evidence only if the error affects a substantial right of the party and . . . if the ruling excludes evidence, the party informs the court of its substance by an offer of proof, unless the substance was apparent from the context"); *State v. Rosales*, 2004-NMSC-022, ¶ 20, 136 N.M. 25, 94 P.3d 768 (declining to review evidentiary error where offer of proof was insufficient). Based on the record before us, Defendant's sole reference to this issue at trial was during Victim's cross-examination in which defense counsel asked her, "Did you apply for [U-Visa]?" Counsel for the State objected and moved to strike, both of which the district court sustained. There was nothing in the record to show that defense counsel made an offer of proof. To further address this issue would require us to assume facts that are not in the record before us such as whether Victim in fact had a U-Visa application pending, whether Victim understood the benefits of such an application prior to being the victim of a crime, and whether Victim was under the impression that an appeal of a guilty verdict would grant her additional benefits. We decline to do so. *See State v. Fuentes*, 2010-NMCA-027, ¶ 29, 147 N.M. 761, 228 P.3d 1181 (refusing to review the defendant's argument that evidence should have been excluded under Rule 11-403 NMRA where the defendant "neither explained how Rule 11-403 applies in this matter nor developed a factual basis that would allow us to evaluate this claim").

### IV. Defendant Failed to Establish Ineffective Assistance of Counsel With Respect to the Showup Identification and We Otherwise Lack the Necessary Factual Record to Consider the Remaining Claims

**{34}** We review ineffective assistance of counsel claims de novo. *State v. Mosley*, 2014-NMCA-094, ¶ 18, 335 P.3d 244. To establish an ineffective assistance of counsel claim, the defendant must show "error by counsel and prejudice resulting from the error." *State v. Grogan*, 2007-NMSC-039, ¶ 11, 142 N.M. 107, 163 P.3d 494. It is the defendant's burden to demonstrate both incompetence and prejudice. *Id.* First, error is shown if the "attorney's conduct fell below that of a reasonably competent attorney." *Id.* (internal quotation marks and citation omitted). Second, prejudice is shown if "counsel's deficient performance prejudiced the defense such that there was a reasonable probability that the outcome of the trial would have been different." *State v. Barela*, 2018-NMCA-067, ¶ 17, 429 P.3d 961 (internal quotation marks and citation omitted), *cert. denied*, 2018-NMCERT-___ (No. S-1-SC-37184, Aug. 29, 2018). We begin with the general presumption that counsel's representation was effective. *State v. Gonzales*, 2007-NMSC-059, ¶ 14, 143 N.M. 25, 172 P.3d 162.

**{35}** Defendant first argues that trial counsel was ineffective in failing to move to suppress Victim's showup identification of Defendant. At trial, Victim testified that she identified Defendant from the backseat of the taxicab, at night, while Defendant was seated, handcuffed, and several car lengths away. Our Supreme Court has previously held that a defense attorney's failure to move to suppress a showup identification was unreasonable and may satisfy the first prong of an ineffective assistance of counsel test. *See Patterson v. LeMaster*, 2001-NMSC-013, ¶ 21, 130 N.M. 179, 21 P.3d 1032

(concluding that counsel was ineffective in failing to file a motion to suppress showup identification because "[s]howup identifications are inherently suggestive and should be avoided" (internal quotation marks and citation omitted)). However, this case cannot be viewed in a vacuum.

**{36}** In convictions involving showup identifications, we balance the identification's inherently suggestive nature against the presence of any sufficient indicia of reliability. *Id.* ¶¶ 21-22. In *Patterson*, the perpetrator's face and head were covered throughout the robbery, the pre-identification descriptions did not match the perpetrator, and the witness was uncertain about the identity of the perpetrator. *Id.* ¶¶ 23-25. In contrast, here, Victim described Defendant as he was leaving the scene within seconds of the sexual assault, and she identified Defendant to police shortly thereafter. She also maintained certainty that Defendant was her attacker. Here, the evidence presented at trial establishes sufficient indicia of reliability. *See id.* ¶ 20 ("When assessing the reliability of a showup identification, courts weigh the corrupting effect of the suggestive identification against the witness's opportunity to view the criminal at the time of the crime, the attention the witness paid, the accuracy of any pre-identification description, the witness's level of certainty at the identification, and the time between the crime and the identification." (internal quotation marks and citation omitted)). Given that any indicia of unreliability went to the weight and credibility (as opposed to the admissibility) of Victim's identification of Defendant, a motion to suppress was unwarranted. Defendant has therefore failed to make a prima facie showing of ineffectiveness based on defense counsel's failure to move to suppress the showup identification. *See State v. Crocco*, 2014-NMSC-016, ¶ 24, 327 P.3d 1068 (concluding that the defendant failed to make a prima facie showing of ineffectiveness where motion to suppress was without merit).

**{37}** Moreover, rather than moving to suppress the showup identification, defense counsel opted to present an expert to discuss the unreliability of showup eyewitness identifications and the effect of stressful moments on a person's memory. At trial, Defendant's sole witness was an expert in eyewitness identification who testified extensively about showup identifications. He shared his opinions about factors that can affect the reliability of showup identifications including, as Defendant has suggested on appeal, the distance, the lighting, stress experienced by Victim, memories related to people of a different race, and suggestibility of law enforcement's presentation of a suspect. This was a reasonable trial tactic that explains counsel's performance. *See State v. Roybal*, 2002-NMSC-027, ¶ 21, 132 N.M. 657, 54 P.3d 61 ("[I]f on appeal we can conceive of a reasonable trial tactic which would explain the counsel's performance, we will not find ineffective assistance."). Having failed to establish that his attorney's performance fell below an objective standard of reasonableness, Defendant's claim fails.

**{38}** Defendant further argues, pursuant to *State v. Franklin*, 1967-NMSC-151, ¶ 9, 78 N.M. 127, 428 P.2d 982, and *State v. Boyer*, 1985-NMCA-029, ¶¶ 17-24, 103 N.M. 655, 712 P.2d 1, that trial counsel was ineffective in handling many other aspects of the trial. The record before us does not contain the facts necessary for a full determination of these issues and therefore, the proper avenue for Defendant to pursue those arguments

is via habeas corpus proceedings. *See State v. Morgan*, 2016-NMCA-089, ¶ 17, 382 P.3d 981; *see also Barela*, 2018-NMCA-067, ¶ 17 ("Our Supreme Court has expressed a preference for bringing ineffective assistance claims through habeas corpus proceedings, rather than on direct appeal.").

## V.     Defendant Was Not Deprived of a Fair Trial

**{39}**    Pursuant to *Franklin*, 1967-NMSC-151, ¶ 9, and *Boyer*, 1985-NMCA-029, ¶¶ 17-24, Defendant further argues that his convictions should be reversed on the alternative ground that they were tainted by plain or cumulative error. "The doctrine of cumulative error requires reversal when a series of lesser improprieties throughout a trial are found, in aggregate, to be so prejudicial that the defendant was deprived of the constitutional right to a fair trial." *State v. Duffy*, 1998-NMSC-014, ¶ 29, 126 N.M. 132, 967 P.2d 807, *overruled on other grounds by State v. Tollardo*, 2012-NMSC-008, ¶ 37 n.6, 275 P.3d 110. Because we have already concluded that Defendant's claims are without merit, we conclude that Defendant was not deprived of his right to a fair trial. *See State v. Samora*, 2013-NMSC-038, ¶ 28, 307 P.3d 328 ("Where there is no error to accumulate, there can be no cumulative error." (alteration internal quotation marks, and citation omitted)).

## CONCLUSION

**{40}**    For the foregoing reasons, we affirm Defendant's convictions.

**{41}    IT IS SO ORDERED.**

**M. MONICA ZAMORA, Chief Judge**

**WE CONCUR:**

**JULIE J. VARGAS, Judge**

**JENNIFER L. ATTREP, Judge**