This decision of the Supreme Court of New Mexico was not selected for publication in the New Mexico Appellate Reports.  Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions.  Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Supreme Court.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date: November 20, 2025**

**No. S-1-SC-40183**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**SOLOMON HAYHURST, III,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SIERRA COUNTY**
**Mercedes C. Murphy, District Judge**

Bennett J. Baur, Chief Public Defender
Caitlin C.M. Smith, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Raúl Torrez, Attorney General
Santa Fe, NM
Tyler M. Sciara, Assistant Solicitor General
Albuquerque, NM

for Appellee

**DECISION**

**THOMSON, Chief Justice.**

**{1}** A jury convicted Defendant-Appellant Solomon "Sam" Hayhurst III (Defendant) of first-degree deliberate intent murder for shooting his father, Solomon "Butch" Hayhurst, Jr. (Victim). Defendant admitted to police that he killed his father, but maintained that he did so because his father became irate and threatened to kill him.

**{2}** The jury rejected Defendant's self-defense claim after considering, among other evidence, Defendant's own testimony and security camera footage that contradicted the statements he made to police. The State also offered witness testimony and documentary evidence to support its theory that Defendant premeditated the murder due to a dispute over Victim's estate.

**{3}** On appeal, Defendant seeks a new trial on the basis that (1) the State mischaracterized his testimony in closing argument, (2) a witness testified that Defendant threatened other family members, and (3) these errors amounted to cumulative error requiring reversal. Rejecting these claims, we affirm Defendant's conviction.

## I.   BACKGROUND

### A.   Facts

**{4}** Just after midnight on July 24, 2019, police arrived at the Hayhurst residence near Truth or Consequences, New Mexico, in response to a home security company call informing police that a firearm had been discharged in the home and an ambulance was needed. Regional Dispatch called Defendant regarding the gunshot, and Defendant admitted that he had shot Victim, but alleged he fired in self-defense.

**{5}** When police entered the home, they saw Victim lying in a pool of blood on the living room floor near the hospital bed on which his wife, Defendant's mother Keva Hayhurst, lay. Victim had been fatally injured by a single shotgun blast to the face.

**{6}** Defendant agreed to waive his Miranda rights and speak with Lieutenant Josh Baker of the Sierra County Sheriff's Office. In a recorded interview, Defendant told Lt. Baker that the conflict began when he refused to serve a "highly intoxicated" Victim more alcohol, at which point Victim became irate and threatened to commit suicide.

**{7}** According to Defendant, Victim then retrieved two guns and went out the front door. Defendant waited to hear a gunshot but expected that Victim would "cower out of it" because Victim had frequently threatened to commit suicide in the past.

**{8}** Victim allegedly charged into the house minutes later, screaming, cursing, and threatening to kill Defendant with a pistol. However, Defendant noted that Victim was too drunk to operate the pistol, spending half a minute in the doorway attempting to slide the action and unable to get a round chambered. Nevertheless, Defendant explained, "I could only stand there for so long while he's cocking, and he's bound to figure 'em out eventually. And I was gonna be the one shot."

**{9}** Defendant said he responded to the threats by grabbing his 12-gauge shotgun, aiming it at Victim's head, and firing. Expressing regret but no remorse, Defendant stated, "I hate the fact that I did it, but it was either me or him."

**{10}** When asked about Victim's physical health, Defendant described Victim as a Vietnam war veteran on full disability, with shrapnel in his spine and chronic pain

requiring a morphine prescription. Defendant explained that Victim had poor vision at close range, due to the loss of his left eye and a large cataract in his right eye. Given his physical condition, Victim was unable to be physically active, had a cane for mobility, and only went outside when Defendant took him to the doctor.

**{11}** In a later interview, Lt. Baker disclosed that the security cameras in the living room were functional, and the footage did not show Victim pointing a gun at Defendant. Defendant reacted with disbelief. He did not know the cameras worked and could not explain the discrepancy between his account and the videos.

## B.    Trial

**{12}** At trial, the State showed the jury Defendant's interviews with Lt. Baker and the videos recovered from the home security system. The security system captured footage from the living room, including the doorway into the hall and the doorway into the kitchen. The videos showed Victim seated at his wife's bedside when Defendant, holding a stack of papers, began speaking. While Victim sat with his hands in his lap, nodding occasionally, Defendant appeared to grow more agitated and began waving the papers around and gesturing emphatically. Defendant is then seen leaving the room and returning with two guns, which he handed to Victim. Victim immediately set one gun down before walking outside with the other. After he came back into the house, Victim began to walk through the living room doorway into the hall while holding the gun upside down, by the stock, in his left hand. Victim did not make it entirely into the hall before he took several steps backward and raised his empty right hand in front of himself. His left hand, which held the gun, remained lowered and a few moments later Victim fell to the floor. Defendant is seen on the video calmly stepping over Victim's body several times as he walked through the living room looking at his phone.

**{13}** The State also introduced testimony from a forensic pathologist that Victim died from a shotgun wound to the right side of the face and had probably been shot from a distance of less than five feet.

**{14}** A toxicologist testified that Victim's blood contained morphine and his blood alcohol content was .066%, less than the .08% concentration at which it is unlawful to drive a vehicle. *See* NMSA 1978, § 66-8-102(C)(1) (2016).

**{15}** Richard Mills, Keva Hayhurst's stepbrother, testified that he had a conversation with Defendant, just one month prior to the shooting, about Victim's will. The prosecutor asked Mills to describe the interaction. Defense counsel immediately asked to approach, and the court held a bench conference, the audio transcript of which is largely inaudible. From what can be heard, defense counsel objected on relevancy grounds to anticipated testimony from Mills that Defendant threatened his sister "Keri, and Keri's daughter, Kodi." The prosecutor responded that he did not intend to elicit testimony about the threats. Testimony resumed with the following exchange:

Prosecutor: Let me make sure that we keep it focused. I want to ask you about the conversation that you had on the roof with [Defendant] in regards to his father and mother and their situation.

Mills: Okay, well, we were talking and I said, because Keri had said she brings dinner once a week or something like that. He said, 'I would just as soon not have them ever show up at all. In fact, I'd just as soon kill both of them, as to have them show up here at this house again.' I said, 'No, your mom's sick on her deathbed, you're just upset.' 'No, I'm not upset.'

Prosecutor: Let me, let me ask you to skip a little bit more forward in that conversation.

Mills then testified that Defendant felt he should be the sole beneficiary of his parents' estate, and expressed anger that Victim had added Kodi to the will.

{16}  Mills further testified, as the administrator of the estate, that Defendant stood to inherit all of the real property and half of the remaining estate under the terms of Victim's will. Mills appraised the estate at just over $400,000, including $81,900 in real estate.

{17}  Defendant testified in his own defense, providing substantively the same account of the shooting that he initially gave to police: Victim entered the house armed with a pistol, shouted and threatened to kill Defendant, and Defendant was left with no choice but to defend himself.

{18}  Defendant also testified about the security camera footage. He explained that the papers he waved at Victim in the video were not the will and instead were related to a restraining order he intended to file against a family member. He could not remember why he was waving the papers around, or what led him to give Victim the guns.

{19}  On cross-examination, Prosecution noted that Victim's alleged fury was not evident in any of the footage. Defendant said his father's outward displays of anger occurred in the kitchen, and were not caught on the living room camera. Defendant acknowledged that he was "obviously mistaken" when he reported the sequence of events to the police. He also conceded that perhaps his father was not screaming as he approached the hallway, and that Defendant already had his shotgun in hand and leveled when his father entered the hallway.

{20}  The prosecutor then asked Defendant about Victim's inability to operate the gun, resulting in the following exchange:

Prosecutor: And he's got the gun in his hand, and that's the weapon that you say you're afraid of.

Defendant: Did I say I was afraid of it? I don't—

Prosecutor: You weren't afraid?

Defendant: I'm not, I don't remember saying if I was or not.

Prosecutor: Oh, okay. So you weren't —I mean—you're just—

Defendant: I had to have been. I mean, obviously. There's no other reason why I would've armed myself in the first place.

Prosecutor: But you don't recall being afraid.

Defendant: When he had the gun coming back into the house, yes.

Defense counsel declined a redirect examination and rested its case.

**{21}** During closing argument, the prosecutor stated:

Now, when we were asking [Defendant] some questions, my colleague Ms. Hicks wrote down exactly what he said about that. We were asking about, you know, whether he was afraid. He says, 'I was not afraid. I never said I was afraid.' And then he said, quote, 'well, I guess I would've been.' He slipped.

Defense counsel did not object or address this characterization of Defendant's testimony during his own closing argument.

**{22}** The district court instructed the jury on first-degree murder and the lesser included offenses of second-degree murder and voluntary manslaughter. The district court also provided the jury with Defendant's requested self-defense instructions. Rejecting Defendant's self-defense theory, the jury convicted on first-degree willful and deliberate murder.

**{23}** The district court sentenced Defendant to life in prison. Defendant appealed directly to this Court.

## C. Appeal

**{24}** On appeal, Defendant argues that the prosecutor mischaracterized Defendant's testimony in closing argument, and doing so was prosecutorial misconduct rising to the level of fundamental error. Defendant further argues that Mills's testimony as to Defendant's threats to his sister and niece was inadmissible, prejudicial, and requires reversal. Finally, Defendant argues that these errors, in combination, deprived him of a fair trial and require reversal under the doctrine of cumulative error. We address each argument in turn.

## II.  DISCUSSION

### A.  The Prosecutor's Mischaracterization of Defendant's Testimony in Closing Argument Did Not Amount to Fundamental Error

**{25}**    At trial, Defendant did not object to the statement by the prosecutor that he now challenges on appeal. Thus, we review this unpreserved issue for fundamental error. *State v. Allen*, 2000-NMSC-002, ¶ 95, 128 N.M. 482, 994 P.2d 728; *see also* Rule 12-321 NMRA (stating "To preserve an issue for review, it must appear that a ruling or decision by the trial court was fairly invoked," but this Court may review unpreserved issues for "fundamental error"). Prosecutorial misconduct amounts to fundamental error only if the misconduct "is so egregious and had such a persuasive and prejudicial effect on the jury's verdict that the defendant was deprived of a fair trial." *Allen*, 2000-NMSC-002, ¶ 95 (text only) (citation omitted).[1] Generally, an "isolated, minor impropriety" does not rise to the level of fundamental error "because a fair trial is not necessarily a perfect one." *Id.*

**{26}**    In the specific context of prosecutorial misconduct in closing argument, we established the test for whether such misconduct constitutes fundamental error in *State v. Sosa*, 2009-NMSC-056, 147 N.M. 351, 223 P.3d 348. We identified "three factors that appear to carry great influence in our deliberations: (1) whether the statement invades some distinct constitutional protection; (2) whether the statement is isolated and brief, or repeated and pervasive; and (3) whether the statement is invited by the defense." *Id.* ¶ 26. All of these factors are assessed "objectively in the context of the prosecutor's broader argument and the trial as a whole." *Id.* As with all unpreserved issues, "we begin with the presumption that the verdict was justified, and then ask whether the error was fundamental." *Id.* ¶ 37. Ultimately, the jury's verdict will stand unless "(1) [the defendant's] guilt is so doubtful as to shock the conscience, or (2) when there has been an error in the process implicating the fundamental integrity of the judicial process." *Id.* ¶ 35.

**{27}**    In this case, Defendant challenges the prosecutor's recitation of his testimony, in which the prosecutor claimed to quote Defendant precisely. Although Defendant stated that he did not remember saying he was afraid, the prosecutor misquoted him and construed the statement as an admission that Defendant had not feared for his life. This was a mischaracterization and constitutes an error.

**{28}**    However, we do not conclude that the prosecutor's mischaracterization rose to the level of fundamental error because there was no "reasonable probability that the error was a significant factor in the jury's deliberations in relation to the rest of the evidence before them." *Id.* (internal quotation marks and citation omitted). We examine the *Sosa* factors and then consider the prosecutor's error within the full context of the trial. First, the prosecutor's statement did not invade a distinct constitutional protection, such as improper comment on a defendant's silence or improper references to a

---

[1]"(Text only)" indicates the omission of nonessential punctuation marks—including internal quotation marks, ellipses, and brackets—that are present in the text of the quoted source, leaving the quoted text otherwise unchanged.

defendant's failure to consent to a warrantless search. *See id.* ¶¶ 27-28 (discussing *State v. Ramirez*, 1982-NMSC-082, 98 N.M. 268, 648 P.2d 307, and *Garcia v. State*, 1986-NMSC-007, 103 N.M. 713, 712 P.2d 1375). We do not find merit in Defendant's argument that he was deprived of due process when the prosecutor implied that Defendant did not act in self-defense, because the jury was instructed that "the argument of counsel is not evidence." *State v. Cordova*, 2014-NMCA-081, ¶ 10, 331 P.3d 980 (text only) (citation omitted).

**{29}** Second, the statement was isolated—it was a single remark during closing arguments that lasted a little over an hour. A prosecutor's isolated or brief comments during closing argument do not typically warrant reversal. *See Sosa*, 2009-NMSC-056, ¶¶ 29, 31. We note that the prosecutor's comment was so brief that Defendant not only failed to object at the time, but then failed to address it in his own closing argument and failed to raise it in his post-trial motion for a new trial, even though he alleged other trial errors. The first time that Defendant identified this comment as error was in this appeal. As such, we do not conclude that this error was a repeated or pervasive one.

**{30}** The third *Sosa* factor—whether the defendant invited the error—is not dispositive but is most likely to lead to the conclusion that there was no fundamental error. *Id.* ¶ 33. Defendant did not invite the error in this case.

**{31}** As in *Sosa*, we emphasize that "in the final analysis context is paramount." *Id.* ¶ 34. We look at the trial as a whole to determine whether "the prosecutor['s] comments materially altered the trial or likely confused the jury by distorting the evidence, and thereby deprived the accused of a fair trial." *Id.* The crucial context in this case is the extraordinary amount of direct evidence available to the jury. The jury saw video footage of Defendant and Victim before, during, and after the shooting. Through that footage, the jury was able to directly assess the demeanor of both Defendant and Victim at the time of the crime. The jury also heard Defendant's extensive accounts of the shooting through his recorded interviews with police as well as his sworn eyewitness testimony at trial. These primary sources provided ample evidence from which the jury could independently assess the level of Defendant's fear at the time of the shooting. *See* UJI 14-5001 NMRA ("[D]irect evidence, such as the testimony of an eyewitness, . . . directly proves a fact.").

**{32}** Against that direct evidence, the single misstatement by the prosecutor at closing argument was unlikely to have had "a persuasive and prejudicial effect on the jury's verdict." *Allen*, 2000-NMSC-002, ¶ 95 (internal quotation marks and citation omitted). The district court properly instructed the jury that it was their "duty to determine the facts from the evidence produced here in court" and that "[w]hat is said in the arguments is not evidence." UJI 14-104 NMRA. We will not assume that the jury gave more weight to the prosecutor's argument—which the jury was instructed was not evidence—than the testimony of Defendant and other competent evidence presented at trial, which it was expressly instructed to consider in reaching its verdict. *See State v. Smith*, 2001-NMSC-004, ¶ 40, 130 N.M. 117, 19 P.3d 254 ("Juries are presumed to have followed the written instructions."). Thus, "in the context of the prosecutor's broader argument and

the trial as a whole," the prosecutor's mischaracterization is not fundamental error. *Sosa*, 2009-NMSC-056, ¶ 26. We will not disturb the jury's verdict on that basis.

## B. The Witness Testimony as to Defendant's Previous Threats Towards Other Family Members Was Harmless

**{33}** Defendant argues that Mills's testimony about Defendant's threat to kill his sister and niece was so prejudicial that reversal is required under either an abuse of discretion or plain error standard of review, the difference being whether the issue was properly preserved. *See State v. Bregar*, 2017-NMCA-028, ¶ 28, 390 P.3d 212.

**{34}** Under either standard, when there is no reasonable probability that the improperly admitted evidence affected the verdict, the error is not grounds for a new trial. *See State v. Tollardo*, 2012-NMSC-008, ¶¶ 25, 36, 275 P.3d 110; *see also State v. Serna*, 2013-NMSC-033, ¶ 22, 305 P.3d 936. We consider the error in light of "all of the circumstances surrounding the error," such as "the source of the error, the emphasis placed on the error, evidence of the defendant's guilt apart from the error, the importance of the erroneously admitted evidence to the prosecution's case, and whether the erroneously admitted evidence was merely cumulative." *Serna*, 2013-NMSC-033, ¶ 23 (text only) (citation omitted).

**{35}** Assuming without deciding that the issue was preserved and Mills's testimony was error, we nevertheless conclude that the district court did not abuse its discretion in admitting the evidence because the testimony was not harmful. The source of the error was an inadvertent remark by a witness. The prosecutor did not elicit Mills's testimony about Defendant's threat, but rather attempted to steer Mills away from that topic by telling him, "Let me make sure that we keep it focused. I want to ask you about the conversation that you had on the roof with [Defendant] in regards to his father and mother and their situation." When Mills testified that Defendant said he would "just as soon kill both [his sister and niece] as to have them show up here at this house again," the prosecutor immediately redirected the testimony to avoid further statements on the topic.

**{36}** When reviewing witnesses' inadmissible remarks, this Court has considered whether the remarks were intentionally elicited by the prosecutor. *See State v. Gonzales*, 2000-NMSC-028, ¶ 39, 129 N.M. 556, 11 P.3d 131, *overruled on other grounds by Tollardo*, 2012-NMSC-008, ¶¶ 37 n.6, 39. When inadmissible testimony is not elicited by the prosecutor, but is an unsolicited comment by a witness, any resulting prejudice is usually curable by a limiting instruction. *See State v. Samora*, 2013-NMSC-038, ¶¶ 22, 28, 307 P.3d 328 (holding that inadmissible testimony from the state's expert that "brain matter" was visible on the defendant's shoes was cured by a limiting instruction); *see also State v. Fry*, 2006-NMSC-001, ¶¶ 52-53, 138 N.M. 700, 126 P.3d 516 (holding that inadmissible testimony that the defendant "had always 'seemed a little mean'" was cured by the court's offer of a limiting instruction even though the defendant refused the instruction for strategic reasons); *but see, e.g.*, *State v. Hernandez*, 2017-NMCA-020, ¶ 21, 388 P.3d 1016 (holding that unsolicited testimony by police officer

that the defendant had confessed could not be cured by a limiting instruction when the defendant had not in fact confessed).

{37}     In this case, Defendant sought neither a limiting instruction nor a mistrial after hearing Mills's testimony. Instead, Defendant waited until after trial to file a motion for new trial in which he argued that the testimony "was REMARKABLY prejudicial and was totally irrelevant to the shooting. All it did was make the Defendant look like a bad person." (Emphasis in original). At the hearing on the motion, defense counsel explained that he chose not to ask for a curative instruction to avoid drawing attention to the comment. The district court found that Mills's "very limited testimony" was not prejudicial and denied the motion for new trial.

{38}     The district court did not abuse its discretion in denying the motion for new trial. In the context of the trial as a whole, under our harmless error analysis, there is no reasonable probability the error affected the verdict. The source of the error was an inadvertent remark by a witness that could have been cured by a limiting instruction. *Samora*, 2013-NMSC-038, ¶ 22. Even if the district court had offered such an instruction and Defendant refused, any prejudice would have been cured. *Fry*, 2006-NMSC-001, ¶¶ 52-53. The fact that defense counsel made the strategic choice not to request a limiting instruction does not alter this analysis. *See State v. Smith*, 2016-NMSC-007, ¶ 47, 367 P.3d 420 (holding that the inadmissible evidence "was judged harmless even by the defense counsel—hence her decision not to request a curative instruction. Defense counsel considered that the slight chance the jury would assume domestic violence was not worth the risk of drawing their attention to it by having a curative instruction given. Thus, any potential error was harmless").

{39}     The testimony was not emphasized by the prosecutor and did not play any further role in the prosecutor's case. Finally, the evidence of Defendant's guilt was direct and abundant. As described previously, the events were recorded on video. The jury heard Defendant's extensive statements and testimony attempting to explain the events in an exculpatory manner. The jury read Victim's will and other documents related to the estate that had direct bearing on Defendant's potential motive. As such, it is unlikely that Mills's unsolicited and unemphasized testimony contributed to Defendant's conviction. We therefore hold that this testimony was harmless.

## C.     No Cumulative Error

{40}     Defendant argues that the cumulative effect of the prosecutor's misstatement in closing argument and Mills's testimony that Defendant threatened his sister and niece deprived him of a fair trial. "The doctrine of cumulative error applies when multiple errors, which by themselves do not constitute reversible error, are so serious in the aggregate that they cumulatively deprive the defendant of a fair trial. The doctrine is to be strictly applied." *State v. Roybal*, 2002-NMSC-027, ¶ 33, 132 N.M. 657, 54 P.3d 61 (citation omitted). Having determined that neither of the alleged errors affected the jury's verdict, we hold that there was no cumulative error.

## III. CONCLUSION

**{41}** For the foregoing reasons, we affirm Defendant's conviction for first-degree willful and deliberate murder.

**{42} IT IS SO ORDERED.**

**DAVID K. THOMSON, Chief Justice**

**WE CONCUR:**

**MICHAEL E. VIGIL, Justice**

**C. SHANNON BACON, Justice**

**JULIE J. VARGAS, Justice**

**BRIANA H. ZAMORA, Justice**